Russell v. Randolph.

RUSSELL'S HEIRS V. H. RANDOLPH.

The ground upon which the grant is attacked, is, that it was obtained by the fraudulent representations of the grantee, in representing himself as having come to the country with his family, when, in truth, he was only a transient person, and had not brought his family with him, and that his domicil was in the State of Maine. If the grant was so fraudulently obtained and without authority of law, it was void *ab initio*, and the land remained subject to location.

It is not a valid objection to a colonial grant of a league of land to the head of a family, that the family of the grantee were not in the country at the time. It was sufficient if the domicil of the grantee was here at the time. This has nothing to do with the question of abandonment.

A man's domicil is determined by his actual residence coupled with an intention to remain, and is irrespective of the whereabouts of his wife and children ; their domicil being the same as his.

If Russell, the grantee, had acquired a residence in Texas, *animo manendi*, constructively his wife and children were here too ; because his residence, by operation of law, would also be their residence ; and if he only left his new residence, and returned to his old, for temporary purposes, either on business or on a visit, it did not annul the new residence, nor could it by his death so happening during his temporary absence, divest his heirs of the title to the land he had acquired as a colonist.

The strongest evidence of fraud in procuring the title, on the part of Russell, is his representation to the Commissioner, in his application for the land ; he states that he has come to Texas with his family, a wife and three children ; when it is in evidence that his wife and children were not at that time in Texas ; and if it was an indispensable requisite of the law, that they should have been actually with him, as a condition upon which title could be extended, it would seem that it would make the grant void, both on account of the fraud, and for want of legal sanction. It seems, however, that if he had such family as he describes, by the usage of the country and the practice of the Commissioner in extending titles, the family were in law constructively with him ; this is presumed from the fact that the officers did so receive him ; and as it was the duty of the Empresario and Commissioner, to inquire into the qualifications of those offering themselves as colonists, the presumption, though not conclusive, is that they did not transcend their authority, or violate their instructions.

Where the original grantee came to Texas, in 1834, with the intention of making it his home, if he liked the country, and after he arrived determined to make it his home, and resided here several months, during which time he applied for and received a grant of a league of land, as the head of a family, representing that he had brought his family, consisting of a wife and three children, with him, which was not the fact, and in 1835 returned to Maine, where he had formerly resided, and where his family was, with the intention of bringing his family out to this country, but died the same year, and one of his children came

to Texas and made a crop on the land, in 1842, and resided here ever since, it was held that the Court below improperly refused to instruct the jury, "that if "they believed, from the evidence, that Russell, the ancestor of the defendants, "applied for and obtained the grant in good faith, and in good faith went for "his family, and died in his efforts to bring them to Texas, in pursuance of the "grant, they will find for the defendants;" *held*, also, the Court below erred in overruling the motion for a new trial on the ground that the verdict was contrary to the evidence.

An attorney appointed by the Court to represent unknown heirs, has authority to prosecute a writ of error.

Error from Montgomery. This was a suit against the unknown heirs of Edward Russell; service by publication; L. L. Bradbury appointed by the Court to represent the defendants; writ of error prosecuted by Bradbury; motion to dismiss writ of error, for want of parties plaintiff in error, and for want of authority in Bradbury to bring the same before this Court. The other facts will be found in the opinion.

*Allen & Hale*, for plaintiffs in error. I. The decree below is erroneous in pronouncing his title void, "for fraud in obtaining it." The case shows that there was no fraud practiced by Russell, either by concealments or representations. He was admitted a colonist by the Commissioner, with a full knowledge of the fact that his family was not with him in Texas at the time.

II. The title vests in Russell full property in the land granted. It is a grant in fee.

III. He died a colonist. He never abandoned the country; his title never was pronounced void by the Ayuntamiento, Commissioner or Empresario.

In these respects, it differs from the titles set up in Heirs of Holliman v. Peebles, 1 Tex. R. 673 and Horton v. Brown, 2 Id. 78.

IV. His inhabitancy in Texas for some eight months was a residence *animo manendi*, and constitutes an established domicil. (Story Conf. Sec. 44.)

The domicil of his family followed his own. His widow

and children were not therefore aliens; but even if they had been, the nine years given them, Hart. Dig. Sec. 600, did not expire before the State Constitution had removed the difficulty.

V. The possession and cultivation by one of the heirs, viz: Mrs. Norton, were, in co-parcenary, the possession and cultivation of all.

*Yoakum & Branch*, for defendant in error. This case is like Brown and Horton, and involves same point as in Holliman and Peebles, with this difference, that Russell came out as an agent for one of the New York companies.

But an important question arises as to the writ of error. The heirs are fighting behind the bush. The attorney, appointed by the Court below, was only appointed for that Court; he ceased with his case there. If the heirs want the revision of this Court, let them enter themselves as such, that they may be made liable for costs.

LIPSCOMB, J. Edward Russell, the ancestor of the plaintiffs in error, came to Texas some time in 1834, and the 21st day of August, 1835, obtained a grant for one league of land in the present county of Montgomery; and shortly thereafter left for the State of Maine, avowedly for the purpose of bringing out his family to settle upon the land conceded to him; and shortly after reaching his family in the State of Maine, where they had remained whilst he was in Texas, he died. In 1841 or '42, Mr. Norton, with his family, his wife being a daughter of Edward Russell, cultivated and made a crop on the land; and they have resided ever since in the State of Texas.

In 1849, the defendant in error, H. Randolph, as assignee of Hugh Hampton, located a valid certificate, issued to the said Hampton, on the said land so granted to Russell; and on the Surveyor refusing to survey the land for him, on the ground that the land, pointed out and designated by him, was covered by Russell's grant, brought this suit to try the right of the said heirs, alleging that it was a part of the public do-

main of the State of Texas, and subject to be located on by him in virtue of his certificate. The ground upon which the grant is attacked, is, that it was obtained by the fraudulent representation of the grantee, in representing himself as having came to the country with his family, when in truth he was only a transient person and had not brought his family with him, and that his domicil was in the State of Maine. If the grant was so fraudulently obtained, and without authority of law, it was void *ab initio*, and never passed any title to the grantee, nor separated the land, embraced in it, from the public domain; and it remained subject to be located upon by any valid certificate. If, however, it was valid when it was issued, it could only be reannexed to the public domain, by forfeiture or by an abandonment of the country. (See Holliman v. Peebles, 1 Tex. R., and Hancock v. McKinney, 7 Tex. R. 384.)

We will first inquire whether, from the facts, the grantee ever acquired a domicil before or at the date of the issuance of the grant to him. This is a question on which there has been a great deal said, both by foreign and our own jurists. They have, however, agreed upon rules by which the question can be settled. The native, or the domicil of a man's birth, is presumed to continue, until he has selected another; but it is admitted that he can choose another domicil, and that he is not tied down to that of his birth. The evidence of such change of his domicil, or what will amount to such change, is not well defined. No precise time of residence at his new selection, has been prescribed as necessary to constitute it as his domicil. If he has selected his new home, with the intent of remaining, it would seem, on authority, to be sufficient, if he is actually at his new home. The intention, without having gone there, or the going there without the intention of making it his residence, will not be sufficient. (See 7th Proposition of Section 44, Story Conflict of Laws; 14 Proposition of Section 47 same author.) The facts are shown to be that the grantee remained in this country from some time in 1834 until August or September of the year following, and

must have been here seven or eight months at least, before the title was extended to him. His declarations and acts all conduced to prove that his determination was fixed and final as to his residence. If he had acquired a residence here, at the time of receiving his grant, as we believe, from the evidence he had ; and returned to his original domicil, not with the view of remaining, but on business, such return would not forfeit the residence he had acquired here. If, however, when he left Texas for his native domicil, it was with the intent to remain there, he would forfeit his domicil here and with it the land acquired would by abandonment of the country, revert to the public domain. There is no doubt, from the evidence, that it was the continued intention of the grantee, to return to Texas, in as short a time as he could prepare to do so, and that he would have returned, without any unnecessary delay, if his design had not been prevented by his early death, while preparing to come back. By the Constitution of the Republic of Texas, Section 10, it is provided : " All persons, Africans, " the descendants of Africans and Indians excepted, who were " residing in Texas on the day of the Declaration of the In- " dependence, shall be considered citizens of the Republic, " and entitled to all the privileges of such. All citizens, now " living in Texas, who shall not have received their portion of " land, in like manner as colonists, shall be entitled to their " land in the following proportion and manner: Every head " of a family shall be entitled to one league and labor of land," &c. Under this provision, it was decided that a married man, who was in Texas at the date of the declaration of Independence, but had not brought his family with him, but had left them in Mississippi, and afterwards went after them and brought them, was, on proof by facts that it was his intention to remove to Texas, entitled to one league of land and one labor. (The Republic v. Young, Dallam, 464.)

In The State v. Skidmore, 5 Tex. R. 469,* it was held that

---

* The Reporter is unable to account for an error which he discovers in the sylabus to that case, as it is reported in the 5th vol. Tex. R. The latter clause, which is in these words, " and was himself absent from the country at that date," is untrue and should be erased.—REP.

where the husband was in the Republic at the date of the declaration of Independence, and returned soon after, and did not bring his family until near three years after, he was entitled to a league and labor of land, upon his making proof that it was his intention to make Texas his permanent residence, when here, and to remove his family as soon as he conveniently could, and his wife's bad health accounted for his long delay. In these cases, the intention of the parties, when here, without their families, of making Texas their permanent residence, and to bring their families, was construed to mean heads of families at the date of the declaration of Independence, under the Constitution. The principle of these cases is, that constructively their families were with them, when the husbands acquired a residence in this country; and the principle is well sustained by eminent jurisconsults, both American and foreign, that the domicil of the husband is the domicil of his wife and children. (See Story's Conflict of Laws, Sec. 44.)

The principle upon which the cases of Skidmore and Young were decided, are believed to be decisive of this case. If Russell, the grantee, had acquired a residence in Texas, *animo manendi*, constructively his wife and children were here too; because his residence, by operation of law, would also be their residence; and if he only left his new residence, and returned to his old, for temporary purposes, either on business or on a visit, it did not annul the new residence, nor could it, by his death so happening during his temporary absence, divest his heirs of the title to the land he had acquired as a colonist. The 31st Article of the Colonization Law of the 28th April, 1832, is as follows: "Every new settler, from the time of his "settlement, shall be permitted to dispose of his land, although "it shall not be cultivated, by testament made in conformity "to the laws that are now or shall hereafter be in force; and "should he die intestate, his lawful heir or heirs shall succeed "him in the enjoyment of his rights of property, assuming, "in both cases, the obligations and conditions incumbent on "the respective grantee." The same provision is found in

the Colonization Law of 1825 ; and the Colonization Law of 1825 was not repealed as to Empresario contracts entered into under it, but such contracts were expressly reserved in the Act of 1832.   The conditions to be performed were all subsequent ; and before any of them could be required, to wit: in six or seven months from the date of the concession, a revolution intervened and the Republic of Texas was established, and all these conditions were abolished, so far as single headright leagues were concerned, by the Act of Congress of 14th December, 1837, on the payment of the land dues.  (This was only the re-enactment of the Act of 1836, December 22nd.)   The record shows that these dues were paid ; (Hart. Dig. Art. 1860 ;) and although the heir may loose his right by a long continued absence, and foreign domicil, a reasonable time ought to be allowed him to become a citizen, or sell his lands.   What this reasonable time should be, may be settled by analogy to the nine years given in subsequent legislation to alien heirs to become citizens or to sell the property of their ancestor.   The Act of Congress of January, 1840, (Hart. Dig. Art. 585,) is as follows : "In making title to land by descent, it shall be " no bar to a party that any ancestor through whom he derives " his descent from the intestate, is or had been an alien ; and " every alien to whom land may be devised or may descend, " shall have nine years to become a citizen of the Republic " and take possession of such land, or shall have nine years " to sell the same, before it can be declared forfeited or before " it shall be escheated to the government."   It was in evidence that Mrs. Norton, a daughter of Edward Russell, the grantee, with her family, made a crop upon the land in 1842, and have resided in Texas ever since.

The strongest evidence of fraud in procuring the title, on the part of Russell, is his representation to the Commissioner, in his application for the land.   He states that he has come to Texas with his family, a wife and three children ; when it is in evidence, that his wife and children were not at that time in Texas.   And if it was an indispensable requisite

of the law, that they should have been actually with him, as a condition upon which title could be extended, it would seem that it would make the grant void, both on account of the fraud and for want of legal sanction. It 'seems, however, that if he had such family as he describes, by the usage of the country and the practice of the Commissioner, in extending titles, the family were in law constructively with him. This is presumed from the fact, that the officers did so receive him ; and as it was the duty of the Empresario and Commissioner to inquire into the qualifications of those offering themselves as colonists, the presumption, though not conclusive, is that they did not transcend their authority or violate their instructions.

Mr. Hotchkiss, a witness, swears that the grantee lived with him some time, at his house at Nacogdoches ; swears that the officers who extended titles to him, knew, at the time, that the wife and children were not actually with him, and that it was usual to issue titles under such circumstances, and that it had been sanctioned by the Attorney General, (Assessor General.) Mr. Rankin, whose affidavit is in the record, swears the practice to have been the same as proven by Mr. Hotchkiss, and .that he had been Surveyor in both Austin's and Vehlin's colonies, and that it was usual in both colonies. We have no doubt, that in hundreds of cases, it was done, the head of the family often preceding his wife and children and making arrangements here by selecting and improving the land, and sometimes making a crop or building cabins before the rest of the family would be brought out. The evidence of Mr. Hotchkiss was not objected to, and therefore cannot be objected to in this Court, as to the instructions of the Assessor General, and would go to establish not only the practice, but would also tend to prove that it was authorized by the proper authorities. And the case of Holliman v. Peebles, 1 Tex. R. 676, further confirms the fact of such being the practice of the country, at least. Were we to decide that this practice was a fraud and unauthorized by law, and the title so issued

void, we might disturb hundreds of the grants obtained by the early settlers, and deprive them of their lands, for which they had encountered all the peril, toil and privation, to which the early settler was exposed. We believe, however, that if, in this case, Russell only went back to bring his wife and children, and would have brought them had it not been for his early death, his heirs are entitled to the land, he had obtained.

The Court was requested, on the trial of this case, by the attorney for the unknown heirs, to charge the jury, "That if "they believed from the evidence, that Russell, the ancestor "of the defendants, applied for and obtained the grant in good "faith, and in good faith went for his family, and died in his "efforts to bring them to Texas, in pursuance of the grant, "they will find for the defendants," which charge the Court refused to give. In view of the evidence and the law, on which we have commented, we believe the Court erred in refusing to give the charge prayed for.

The Court erred also in overruling the motion for a new trial, on the ground that the verdict was contrary to the evidence.

There is nothing in the grounds stated by the counsel for the appellee, in his motion to dismiss the writ of error, in the case. We have no doubt, but the attorney, appointed by the Court to represent the heirs, had a right to bring up the case for revision. For the above errors the judgment must be reversed, and the cause remanded for a new trial, in accordance with the opinion given by us.

Reversed and remanded