LEWIS & McGINNIS v. HARRIET A. AMES.

1. DEED OF GIFT—WILL.—A devise by will of land which had before been conveyed by deed of gift properly authenticated for record, executed by the testator to the devisee, creates no presumption that the deed of gift had never been delivered, or that it was not considered a valid instrument by the parties.

2. RED RIVER MUNICIPALITY.—The municipality of Red River had no defined limits until 1837, though recognized by the consultation of 1835.

3. JURISDICTION.—When, from the uncertainty in the construction and execution of the laws and the facts pertaining thereto, the venue where jurisdiction should have been exercised over the estate of a decedent was in 1843 rendered uncertain, and all the parties interested in the estate acted upon and acquiesced in the assumption of jurisdiction by a county court which had jurisdiction of the subject-

matter of estates, and jurisdiction over the particular estate was assumed by no other court at that time, such jurisdiction cannot now be called in question collaterally.

4. WILL CANNOT BE ATTACKED COLLATERALLY.—A will admitted to probate is presumed valid, and its invalidity can only be established in a direct proceeding between the proper parties in interest instituted for that purpose.

5. ADMINISTRATOR.—An administrator appointed in 1852 failed to give bond within twenty days after his appointment, but in giving bond thereafter his appointment was confirmed without objection from any source : *Held*, That in a collateral proceeding the mere irregularity of his appointment cannot be held to vitiate his acts, otherwise legal, he having acted for a number of years.

6. EVIDENCE.—No portion of the transcript of the proceedings of an administration under which land was sold on account of the impracticability of partitioning without sale need be recorded in the county where the land is situate in order to permit the introduction of the transcript in evidence in a suit involving the title to the land.

7. MARRIAGE.—"Marriage deemed null in law," the issue of which were legitimatized by the act of January 28, 1840, was in contemplation of that act a real marriage according to nature, deficient only in the existence of some legal impediment, or the want of compliance with the forms of law in contracting it; while the law relieved against the impediment and the want of legal forms, it did not make or attempt to make concubinage marriage.

8. MARRIAGE.—Marriages contracted in Texas prior to the revolution of 1836 should be regarded as mere civil contracts, and sustained whenever the consent of the parties and their intention to enter into a state of matrimony and assume its duties and obligations is clearly shown.

9. Smith *v.* Smith, 1 Tex., 621, Lockhart *v.* White, 18 Tex., 110, and Carroll *v.* Carroll, 20 Tex., 731, discussed, and this case distinguished from Yates *v.* Houston, 3 Tex., 433, and Babb *v.* Carroll, 21 Tex., 765.

10. ADMINISTRATION.—The action of a County Court in granting letters of administration upon an estate in 1845, and directing partition without notice to parties interested in a will which had been probated and was on file in the same court, and which was made by the decedent and disposed of the estate, cannot affect the rights of the legatees under the will.

11. A judgment in a proceeding for partition instituted against an executor alone who at the time had no interest, and to which the legatees, under a will of the decedent, who were at the time known to petitioner, were not made parties, will not avail as constituting color of title under the three-years' limitation against such legatees.

APPEAL from Marion.    Tried below before the Hon. J. D. McAdoo.

This is an action of trespass to try title, instituted in the District Court of Cass county on the 4th day of July, 1857, by appellants against appellees, to recover three sections of land now in Marion county, a part of the league and labor surveyed and patented to Robert Potter by virtue of his own headright certificate.

The venue was subsequently changed to Harrison county, in the 6th district, by reason of the incompetency of W. S. Todd, judge of the 8th district, to try said cause, and afterwards was changed to Marion county, in the present 7th district.

Defendants' original answer, filed October 5, 1857, was general demurrer and plea of not guilty; also statute of limitation of three, five, and ten years, as well as long-continued possession of fifteen years.

Defendants, by amended answer filed March 31, 1859, reiterate their pleas of the statute of limitations, setting up claim to said land by virtue of patent to Robert Potter and under order of partition of said land, made by the Probate Court of Bowie county, making the transcript of the Probate Court of Bowie county an exhibit thereto.

On the 16th of October, 1859, plaintiffs filed an amended petition, in which they set out fully and specifically their title to said land sued for substantially as follows, viz:

On the 8th day of February, 1842, Robert Potter by deed conveyed one section of said land to Mrs. Sophia A. Mayfield, the wife of James S. Mayfield; and that on the 2d day of March, 1842, Robert Potter died in Red River county, in the Republic of Texas, upon the land in controversy, leaving a last will, wherein he gave and bequeathed to said Mrs. Mayfield the said section above mentioned, and also two other sections of his said survey; and that said last will was on the 10th day of January, 1843, admitted to probate in the county of Red River, appending to said amended peti-

tion a transcript of proceedings in said Probate Court. And that afterwards Mrs. Mayfield, still being the wife of James S. Mayfield, died intestate in the county of Fayette, on the — day of April, 1852, seized and possessed, in her separate right, of said three sections of land; and that she left surviving her, her said husband and six minor children, naming them; and that at the May Term, 1852, of the County Court of Fayette county, letters of administration were granted upon the estate of Mrs. Mayfield to Benjamin Shropshire, who qualified and administered said estate; and that at the December Term, 1856, of the County Court of Fayette county, said Shropshire was ordered to sell said land for partition among the heirs of Mrs. Mayfield, her husband having died long before that date; that, in obedience to said order of sale, the said Shropshire, as said administrator, sold said land, and appellants became the purchasers thereof; that said sale was confirmed, and on the 25th day of February, 1857, said administrator made a deed to said land to appellants, making said deed and a certified transcript of the proceedings in the County Court of Fayette county in said estate of Mrs. Mayfield an exhibit thereto.

And that the said last will of Robert Potter being proved as aforesaid, was never in anywise set aside, nor had any proceeding therefor ever been instituted, and that the same was binding and in full force. And that one Robert W. Smith, the testamentary executor of said will, was, about the 14th day of February, 1843, appointed executor of said will by said Probate Court of Red River county, and administered said estate under said will in said Probate Court until about May 26, 1845, when he resigned said executorship, settled his accounts, and was discharged by said Probate Court.

And that said act of settlement and order of discharge were the last acts of administration of said estate, and that said administration had constantly been and was then pending in the County Court of Red River county.

And that the pretended administration of said estate in Bowie county was void for want of jurisdiction of the Probate Court of Bowie county of said estate, pending administration in Red River county.

And that the pretended judgment of the County Court of Bowie county partitioning said land was null and void for the want of service on any and every party interested in said estate.

And that the defendant, Harriet A. Ames, before her marriage with her co-defendant, was the wife of one Solomon C. Page, who had, during his said marriage with the said Harriet, received a league and labor of land from the Republic of Texas.

And that the said Harriet A. Ames was never the lawful wife of the said Robert Potter, and that her claims thereto were in fraud of the rights of petitioner.

On the 22d of May, 1871, appellee, Harriet A. Ames, filed an amended answer, alleging the death of her late husband and co-defendant, Charles Ames, praying to defend this suit, and again pleading the statute of limitation of three, five, and ten. years, alleging herself to be the surviving wife of Robert Potter, deceased, and that the land sued for was the community property of herself and the said Potter, and that the same was set apart to her by a decree of the County Court of Bowie county, and that she had held, possessed, cultivated, and enjoyed the same by virtue of said community right and partition; making a transcript of the records of Bowie county, in said suit of petitioner, an exhibit thereto, also alleging improvements in good faith, giving value thereof, and praying to be allowed the value thereof.

On June 1, 1872, defendant amended her answer, alleging the deed from Robert Potter to Mrs. Mayfield to be of no force and effect, that the same was without consideration, and a fraud upon the rights of defendant and a cloud upon her title, and that there was born unto the said Potter

and defendant in lawful wedlock two children, naming them, and that she and said children were the only family of said Potter recognized by him in Texas, and that as the head of said family the land sued for was granted to the said Potter by the Republic of Texas; that the will of said Potter was in fraud of the rights of said children and defendant and in violation of the statute of wills then in force in the said republic, and therefore void; alleging outstanding title in the minor heirs of one of said children of the said Robert Potter, one of them having died in infancy and the other died leaving surviving him children; alleging the administration of the estate of said Sophia A. Mayfield by said Shropshire to be a nullity, by reason of no service of his application for letters of administration on said estate, and his failing to give bond as such administrator in the time required by law; alleging further, that appellants did not pay the purchase-money for said land before instituting this suit.

On the fourth of June, 1872, appellants filed an amended petition, alleging that more than four years have elapsed since the date of admitting said will to probate, and that no action had been taken in a court of competent jurisdiction to set aside said will, by reason whereof defendants were and are barred of any action to set aside said will; and, by way of replication to said pleas of the statute of limitation, alleged the coverture of Mrs. Mayfield at the date of said deed by said Potter to her and at the date of the death of said Potter, and that said disability of coverture continued to the date of her death, on the thirtieth day of March, 1852; and that afterwards, about November, 1852, the said James S. Mayfield died, leaving surviving him the children of the said marriage, five minor children, whose minority continued until after the sale of said land to appellants by said Shropshire.

On the fifth day of June, 1872, defendant filed an amended answer, alleging that defendant intermarried with Charles

Ames about the twenty-third day of August, 1842, and continued the wife of said Charles Ames to the date of his death, in 1866, and reiterating her previous defenses of fraud upon the statute of wills, and the want of jurisdiction of the court of Red River county to probate said will, and the nullity of the administration of the estate of Mrs. Mayfield in Fayette county, for reasons aforesaid.

On June 6, 1872, appellants filed an amended petition, setting up the statute of two years in bar of the frauds alleged in defendants' several answers and amended answers.

On the seventh of October, 1859, appellants demurred to the several pleas of the statute of limitation.

Upon the trial of the cause, April, 1872, the court overruled said demurrer and exceptions of appellants to defendants' answers and amended answers, and a jury being waived, after hearing the evidence, gave judgment for appellants for the section of land conveyed to Mrs. Mayfield by the deed of Robert Potter in 1842, and for all cost of suit; and as to the other two sections adjudged that appellants take nothing, from which judgment both parties gave notice of appeal, but only the plaintiffs in the court below perfected the appeal.

*J. H. Rogers* and *A. W. O. Hicks*, for appellants, in support of the proposition that Potter could convey his headright land to Mrs. Mayfield by deed, though his wife was living and it was to her injury, cited 15 Tex., 468; 17 Tex., 99; 24 Tex., 444.

2. That no one but his children could controvert his right to dispose by will of all his community interest, citing 10 Tex., 87, 94; 12 Tex., 458, 459; 17 Tex., 91; 13 Tex., 94; 14 Tex., 171.

3. That appellee lost the right to annul the will by suit after four years from its probate, citing Hart. Dig., art. 997; 17 Tex., 30, 80; 15 Tex., 288; 2 Tex., 590; 10 Tex., 83, 94; 12 Tex., 456.

4. After the conveyance to Mrs. Mayfield and the probate of Potter's will Mrs. Ames had neither title or color of title to form the basis of limitation, citing 26 Tex., 730 ; 27 Tex., 248 ; 15 Tex., 467, 470.

5. The partition was a nullity and cannot be made the basis of the statute of limitations, citing 18 Tex., 582, 596 ; 23 Tex., 30, 36, 113 ; 32 Tex., 129.

*H. McKay,* also for appellants.

*Moseley & Sparks, D. B. Culberson,* and *R. A. Reeves,* for appellees, filed on December 12, 1872, their brief, contending—

1. That Mrs. Ames acquired title to the property as consort of Robert Potter, deceased, citing 21 Tex., 765 ; 20 Tex., 237 ; Yates *v.* Houston, 3 Tex., 433 ; Fishback *v.* Young, 19 Tex., 515 ; Rice *v.* Rice, 31 Tex., 174 ; Lee *v.* Smith, 18 Tex., 142 ; Smith *v.* Smith, 1 Tex., 621 ; Paschal's Dig., art. 3226.

They also contended that Potter's will was not probated in the proper county ; that the County Court of Fayette county acted without jurisdiction, and that plaintiff's cause of action was barred by limitation, citing in support of the last proposition Paschal's Dig., arts. 4622, 4623 ; Lacy *v.* Williams, 8 Tex., 183 ; 6 Tex., 369; and 8 Tex., 176.

ROBERTS, CHIEF JUSTICE.—The appellants, who were plaintiffs below, were entitled to recover the whole of the land sued for, if it was shown that Robert Potter conveyed it by deed and by will to Mrs. Sophia A. Mayfield, that the will was legally probated, and plaintiffs derived the title to Mrs. Sophia A. Mayfield's interest through a legal administration of her estate, provided Mrs. Harriet A. Ames was not legally the wife of Robert Potter and her children by him legitimate children, in reference to this land, and she has not acquired a right to the land or a part of it by the statute of limitations.

This proposition brings into review the following questions, to wit:

1st. Was there a sufficient conveyance by deed from and will of Robert Potter of the land in controversy to Mrs. Sophia A. Mayfield?

2d. Was the will of Robert Potter legally probated?

3d. Was there a legal administration of the estate of Sophia A. Mayfield, and did plaintiffs legally purchase said land from the administrator thereof?

4th. Was Mrs. Harriet A. Ames legally the wife of Robert Potter, so as to acquire a community interest in the land sued for, or a homestead interest therein, and as to make his and her children his surviving widow and heirs in reference thereto?

5th. Did she acquire a right to the land, or any part of it, by the statute of limitations?

1st. Robert Potter, in the city of Austin, on the 8th day of February, 1842, executed a deed of gift to Mrs. Sophia A. Mayfield to a part of his headright then patented, lying and being on Ferry Lake, in the county of Paschal, and being section 12 in range 17, township 20, as known and marked on the map of surveys made by the authority of the United States, which deed was witnessed by C. Van Ness and K. L. Anderson.

It was acknowledged before Joseph Lee, C. J. T. C., and E., notary public, on the 9th day of February, 1842, and recorded in the county of Cass on the 1st day of March, 1854.

On the 11th day of February, 1842, Robert Potter made his will, witnessed by M. C. Hamilton, F. Henderson, and N. B. Yancy, in which he devised this same section of land 12, with section 13 and fractional section 24, on which his residence was situated, all being part of his headright, to Mrs. Sophia A. Mayfield.

He gave in said will, to Mrs. Mary Chalmers, three sections of his said headright.

He gave to Mrs. Harriet A. Page a portion of his said headright, being the balance of it there located, (except one hundred acres to her brother, John D. Moore,) together with some slaves, stock, and other personal property.

He gave to John W. Crunk a negro girl; to James S. Mayfield his "favorite horse Shakspeare;" to Dr. John G. Chalmers the balance of his property, and appointed Col. Robert W. Smith his executor. This embraced all of his effects. There is no reference in his will to any children or to a wife.

It is argued that section 12, being embraced in the will as well as in the deed, is evidence that the deed was never delivered or considered a valid instrument by the parties to it. To this it may be answered that it was acknowledged for record before the will was made, and that it may have been included in the will to make more sure the gift. But whatever may have been the object or fancy, it is not perceived that including it in the will would be evidence of itself that the deed was not a valid instrument.

The deed and will are in proper form, and stand unimpeached so far as relates to their valid execution.

2d. Was the will of Robert Potter legally probated?

It is contended that it was not legally probated, not from any objection to the manner or degree of proof of it, but because the County Court of Red River county had no jurisdiction thereof, for the reason that Potter died at his residence on Ferry Lake in March, 1842, which was then a part of the county of Bowie, and not a part of the county of Red River. His residence was north of the lake sometimes called Soda Lake, and near the line between Texas and the United States, which accounts for the section surveys made before the dividing line between the two republics had been run.

Red River was recognized as a municipality by the consultation in 1835, with no defined limits otherwise than by the remote settlements therein. In 1837 its limits were indicated by an act of Congress, and was bounded on the north

by Red river, on the west by the Bois d'Arc, (creek that runs into Red river,) on the south by the Big Cypress and Soda Lake, and on the east by the line of the United States. (Paschal's Dig., art. 293.)

Before this petition was filed, (4th July, 1857,) the locality of Potter's residence had been in Red River county, in Paschal county, (a judicial county,) in the southern division of Red River county, in Bowie county, and (when the suit was filed) Cass county, as shown by the laws of the Congress and the State of Texas.

By an act of Congress approved on the 17th day of December, 1840, the county of Bowie was created, embracing the present limits of that county, and also extending it down south of Sulphur Fork of Red river, covering the original territory of Cass county, as it existed in 1857, to the Big Cypress and Soda Lake. (5 Cong., 97.)

During the same session, and before there could have been any organization pursuant to said act, another act of Congress was approved, on the 28th of January, 1841, which set apart all that part of old Red River county south of the Sulphur Fork of Red river, under the name of Paschal, as a county for judicial purposes, but retaining it as a part of Red River county in the election of representatives in Congress. (5 Cong., 57.)

At the January Term, 1842, of the Supreme Court these judicial counties, such as Paschal, of which quite a number had been created, were decided to be unconstitutional, upon the ground that a district of country could not be made a county for any purpose unless it was given a representative in Congress. (Stockton v. Montgomery, Dallam's Dig., 473.)

By an act of the 5th of February, 1842, the location of the county seat of Paschal county was provided for. (6 Cong., 118.)

By a supplimental act of December, 1842, it was directed that the clerk of the county and probate courts of the county

of Red River should transmit all the papers of every description belonging to the county of Bowie to that county. (7 Cong., 3.)

At the same session, on the 16th January, 1843, a supplemental act was passed declaring Bowie county to extend to the Big Cypress and Soda or Ferry Lake, and directing that its citizens south of Sulphur Fork should vote with Bowie county, in which it is styled "a new county taken from the county of old Red River, called Bowie county." (7 Cong., 31.)

This act provided for the running of the line between Red River and Bowie, and for the transmission of all papers and documents from Red River " which belong within the territory of Bowie county."

By an act of the 1st February, 1844, it was provided that all of that portion of the counties of Red River and Bowie should be known and styled the southern division of Red River county, and should vote with Red River, and the courts should be held at two places, Clarksville and Dangerfield. (8 Cong., 54; Paschal's Dig., art. 293.)

An act of the 29th of January, 1845, repealed the last-mentioned act, and provided that the clerks of the district and probate courts of Red River should transmit to the corresponding officers of Bowie county all the papers and business which originated in that portion of the southern division of Red River county which, by that act, "is again included within the limits of the said county of Bowie," and that the process that had been made returnable to Dangerfield should be returnable to Boston, the county seat of Bowie county, and further, that all acts authorizing the holding of courts at more than one place in any county should be repealed. (9 Cong., 44.)

By the act of the Legislature of the 26th of April, 1846, that part of Bowie county which was south of Sulphur Fork was made the county of Cass. (10 vol. stats., 185; Paschal's Dig., art. 309.)

All these changes took place in about ten years, originating in the great extent of the county of Red River originally and the sparseness of the population in settlements distant from each other. The first effort on the part of the Government to obviate the inconvenience of such a state of things which existed in many sections of the country as well as in Red River, was to create counties for judicial purposes, and that being decided early in 1842 to be unconstitutional, a resort was had to a provision for holding courts in different districts of the same county with the same county officers. That being found inconvenient, was soon abandoned, and as the population increased so as to justify it, new counties were carved out of the old, and organized. The delays and failures in complying with one law would give time to pass another, looking to another object, and thereby confusion more or less is to be found in the proceedings of the public authorities.

Robert Potter having died in March, 1842, George Gordon and Charles Ames applied on the 3d day of May, 1842, to the chief justice of the county of Red River for letters of administration upon his estate, alleging that he died intestate, and that they applied at the instance of his widow. Letters having been granted they proceeded to administer the estate until the 31st day of December, 1842, when John G. Chalmers, by attorney Charles De Morse, presented the will of Robert Potter to the Probate Court of Red River county, which was proved by one of the witnesses, N. B. Yancy, and admitted to probate by an order of the court on 10th day of January, 1843. Robert W. Smith gave bond, with A. H. Latimer and G. H. Bagley as sureties, and obtained a grant of letters of executorship on the 10th of February, 1843. He proceeded to administer the estate under the will until the 28th of May, 1845, when he resigned and was discharged, without the property having been distributed according to the will. During his executorship his authority in that capacity was recognized by Ames, who

in 1842 had married Potter's widow, as she claimed to be, as well as by that person herself in numerous instances. He turned over the property to Smith, reported to the court the amounts of funds that he had used, and acknowledged his liability to the executor therefor.

Mrs. Ames and her husband gave a bond and security to Smith for a large amount of property, a part of which had been willed to her, to be returned upon demand. Smith's exhibits and accounts show property turned over to her under the will.

On the 20th day of February, 1844, an order was entered showing that Robert Smith had presented a report, and that he was given further time—"until the next term of the court to be holden at Dangerfield, in the southern district of Red River, on the second Monday in April thereafter." At the March Term, 1845, he was ordered to report the whole of his proceedings, and at the May Term, 1845, having fully accounted, he was discharged, after having returned a list of property and land papers, which was ordered to be "filed for the successor of said executor," showing that his resignation and discharge was not regarded, as now intended to be, a closing of the administration of the estate.

These laws that have been referred to and the proceedings under them show, 1st, that the act creating Bowie county on the 17th of December, 1840, never went into effect as to that part of it south of Sulphur Fork, but was superseded by the act of 28th January, 1841, creating Paschal county and attaching it to Red River for voting; and as that act, so far as to making it a separate county for judicial pur- poses, was about that time declared to be unconstitutional, its organization failed, and its territory still remained a part of Red River county. Hence that was the proper county for the administration of the estate when letters were ap- plied for by Gordon and Ames in May, 1842.

The will was presented and probated on the 10th day of January, 1843, a few days before the act of 16th January,

1843, creating Bowie county, including the territory south of Sulphur Fork. Still it is reasonably inferred that that act was not carried out before it was superseded by the act of the 1st of February, 1844, creating the southern district of Red River, the courts in which were to be held at Dangerfield, thus legalizing the retention of the business pertaining to that district in the courts of Red River. And this is further confirmed by the act of the 29th of January, 1845, which again includes this territory in the county of Bowie, and directs the transfer of the papers and documents to Bowie county. When the probate was made the County Court of Red River certainly had jurisdiction, and the bond being given by Smith, and an order made to issue to him letters of executorship afterwards, to wit, on the 14th of February, 1843, could not affect the legality of the probate of the will on the 10th of January, 1843.

From some cause or other this act of the 29th of January, 1843, requiring the District and County Courts and county surveyor of Red River county "to transmit all the documents and papers of every description which belong within the territories of Bowie and Lamar to their respective counties," was never carried into effect until the act of the 1st of February, 1844, which retained them in Red River county, and provided for the disposition of the business relating to them in the southern district of Red River county at Dangerfield, and, as we may presume, this act was not carried out by transmitting the documents and papers to an office in Dangerfield until the final act of the 29th of January, 1845, which recognized the business belonging to this territory as being properly in Red River to be transacted at Dangerfield, and directed its transfer to Bowie county, in which act it is provided that "that portion of the southern division of Red River county is by this act again included within the limits of the said county of Bowie," and prohibits the holding of courts in more than one place in any county. It is to be observed that in none of these acts was there pro-

vided any compensation to the officers for the large amount
of work necessary to carry them into effect by transmitting
the documents and papers of every description, and this, in
part, may account for the delays and failures which produced
so much confusion and change, as exhibited in the acts of
Congress of that period, in relation to the judicial proceed-
ings pertaining to that portion of Red River county. The
last-recited act settled the matter. For in pursuance of it
Charles Ames was appointed "administrator of Robert
Potter, deceased," by an order of the County Court of Bowie
county, at the October Term, 1845, gave bond on the 24th
of November, 1845, which on the same day was filed by the
clerk of said court, as shown by his file entry thereon, the
"documents and papers" referred to in the law being the
record, entries, proceedings, and papers of the County Court
of Red River county relating to the administration of Gor-
don and Ames, and to the executorship of Robert W. Smith,
including the will and its probate.

The reference to these various laws and the proceedings
under them that has been made, show (2d) that notwith-
standing the confusion and uncertainty as to the county in
which the judicial proceedings should have been instituted
and carried on in the estate of Robert Potter, the parties
most interested therein, and especially Mrs. Ames and her
husband, Charles Ames, by acts and acquiescence, under a
full knowledge of it, recognized Red River county as the
proper venue for the administration and executorship of the
estate from the time of Potter's death in March, 1842, to
Smith's resignation as executor, and his discharge on the
28th day of May, 1845.

It must be considered that the County Court of Red River
county, as a court, had jurisdiction of the subject-matter of
estates, and if, from the uncertainty in the construction and
execution of the laws, and the facts pertaining thereto, the
place or venue where such jurisdiction should be exercised
was rendered uncertain, and all of the parties interested in

the estate acted upon and acquiesced in the assumption of jurisdiction, it being assumed in no other place during that period, it is not perceived upon what principle the jurisdiction can now be called in question collaterally, so as to treat the acts of said court, done thus in good faith, as nullities. (Burdett *v.* Silsbee, 15 Tex., 615 ; Grande *v.* Herrera, 15 Tex., 536 ; Green *v.* Rugely, 23 Tex., 550.)

There has never been any proceeding instituted to impeach the validity of the will or its probate, and therefore it must be regarded as a valid will, (more than four years having elapsed since its probate,) and disposes of the property of which Potter died possessed.   (Paschal *v.* Acklin, 27 Tex., 196.)

The administration of Ames taken out in Bowie county cannot affect its validity thus established by simply disregarding it.   It was disregarded with a full knowledge of its probate and of the action of Smith under it, as evidenced by the papers and proceedings from the County Court of Red River then filed in the County Court of Bowie county. This is in no respects on principle similar to the case of Lovering *v.* McKinney and Williams, wherein it was held that administration taken out in Matagorda county, while an administration of the same estate was legally pending in Shelby county, was null and void.   (7 Tex., 524.)

It is to be remarked that in that case the question arose upon a plea of *ne unques executor*, and not collaterally.

3d. Was there a legal administration of the estate of Sophia A. Mayfield, and did plaintiffs legally purchase said land from the administrator thereof?

It is contended, as shown in the bill of exceptions to the evidence, that the letters of administration granted to Benjamin Shropshire on the 7th day of May, 1852, by the County Court of Fayette county, were illegal and void, and that his acts as administrator of said estate, including the purchase of the land by plaintiffs at said administrator's sale, as evidenced by deed of the 25th of February, 1857,

were null and void, because letters of administration were granted without ten days' notice of his application therefor, only seven days intervening between the filing of the application and the appointment, and because he failed to give a bond and qualify within twenty days after his appointment.

It is not perceived that the first ground taken is borne out by the record. The application of Shropshire is not dated, nor does it appear to have been filed as of any date named. The order of the court recites that legal notice had been given, and the contrary does not appear in the record. This order of appointment is made on the 31st of March, 1852. His bond was filed on the 7th of May, 1852; whereupon his appointment was confirmed, and letters ordered to be issued to him by the court; after which he entered upon the administration of the estate by obtaining orders, rendering exhibits and accounts, and selling property in the regular course of administration for five years or more, during which time the order was obtained to sell the land sued for in this action to effect partition, and sale thereof was duly confirmed.

His not giving bond within the twenty days might have enabled the court to have vacated his conditional appointment that had been entered, but not having done it, and having confirmed his appointment upon the bond being filed, and he having acted under it for years without objection from any person, and under the direction of the court, the mere irregularity in his appointment cannot be held to vitiate his acts otherwise legal. (Paschal's Dig., art. 1294; Poor *v.* Boyce, 12 Tex., 440.)

Another objection to the transcript of the proceedings from Fayette county, contained in the bill of exceptions, was, that the order of the court for the partition of the estate of Sophia A. Mayfield was not recorded in Cass county, and being a muniment in plaintiff's title, was not admissible in evidence, because it was not so recorded. This refers to

the law requiring an order or a decree of partition to be recorded in the county where the land is situated to render it admissible in evidence. (Paschal's Dig., art. 4710.) In this case there was no order or decree of partition of the land between the heirs of Mrs. Mayfield, in the sense of said law, there being in fact no partition of the land, but a sale of it by the administrator on account of the reported impracticability of making a partition. This objection to the evidence was therefore not tenable.

4th. Was Mrs. Harriet A. Ames legally the wife of Robert Potter, so as to acquire a community interest in the land sued for, or a homestead interest therein, and to make his and her children capable of being his heirs in reference thereto?

The evidence shows that Potter and Mrs. Ames met for the first time after the declaration of the independence of Texas in 1836. He had two children in North Carolina, and no wife, (his wife having before that time been divorced from him.) Mrs. Ames had a husband, Solomon Page, with whom she had lived more than a year before that time in Texas. Solomon Page obtained a headright for a league and labor of land as the head of a family, and in 1840 was divorced from his wife, Harriet A., and continued for ten years afterwards to live in Texas.

In September, 1836, as testified to by Mrs. Harriet A. Page, she and Potter were married by bond, which has been lost. It was proved that they lived together in the same house after the manner of husband and wife before and after that time and up to the time of his death in March, 1842. They had two children living at the time of his death. They were never married otherwise than by bond, as above stated, according to her own evidence.

Thus the facts involved in the question of marriage and its legality are plain. There was also evidence of mutual recognition and common repute, of which there is an immense amount, pro and con, in the record—some of it

tending to show that they did not recognize each other as husband and wife, although they lived together and slept together; some of it tended to show that they did recognize each other as husband and wife. There was evidence tending to show that she heard and believed that her husband, Page, was dead shortly after she met Potter. Other evidence tended to show that after she was taken under Potter's protection her husband visited her for the purpose of procuring her return home, and she states that she was afterwards informed of his application for a divorce from her.

During the dominion of Spain and Mexico over this country the opinion was entertained by the settlers from the North American States that marriage could not be legal unless the rites of matrimony were celebrated by a Catholic priest. So strong and prevalent was this opinion that many of such persons, who had long been married before their emigration, were married again here by a priest, for the purpose of the better security of their citizenship and as a merit in the acquisition of lands. It is part of the history of Eastern Texas that Father Maldoun, an Irishman and priest, made himself agreeably useful in this business. Most of those settlers were Protestants, in education at least, and had a prejudice against being married by a Catholic priest when marriages were sought to be contracted here by single persons; and if it had been agreeable there were priests to be found only at a few towns, at a remote distance from many of the settlements of the Americans, as the early settlers were called. Under these circumstances many marriages were contracted by bond, entered into to bind the consciences of the parties, though deemed null in law. (See form of bond in the case of Sapp *v.* Newsom, 27 Tex., 538.) Others were married by Protestant ministers, with or without bond. Texas being then and afterwards a place of refuge for unfortunates, persons came here and lived as husband and wife, leaving behind a living husband

or wife; and persons lived here together as husband and wife having in this country a living husband or wife. Such persons sometimes entered into bonds as a means of fixing their relation in this country. There were also persons living together under agreements, whether written or unwritten, to terminate at the pleasure of either party, which, however, it is believed were not as frequent in this country as it was said to be in portions of Louisiana, with which Eastern Texas had much communication in those early days of its history.

Society in this country was not sufficiently organized (the mass of people being sparsely scattered over the country and strangers to each other upon coming here) to frown upon these irregularities in reference to the marriage state, as might have been done in older countries.

In order to properly construe and understand the evidence of recognition and common repute, as well as the acts of the parties, as tending to establish the relation of a man and a woman who lived together, we must cast our minds back to the contemplation, as well as we now can, of their true import in the state of society as it then existed.

The character and relative condition of the parties must also be taken into consideration in interpreting their conduct towards each other, and this would apply to all states of society, whether in Europe or America, when any doubt is cast upon the relation of the parties claimed to be husband and wife, or the contrary.

These marriages in Texas, deemed null in law, were of such pressing consideration and consequence as to demand the attention of the Anglo-Americans even in the very first initiatory stage of their assumption of superior power in Texas. By an ordinance of the consultation of the 16th of January, 1836, bond marriages previously contracted were legalized, and officers were named who were given the right to solemnize the rites of matrimony thereafter. (Hart. Dig., art. 2435.) And again, after the Republic of Texas was fully

organized and established as an independent government, on the 5th of June, 1837, the Congress passed a law legalizing all bond marriages contracted previous to that time, and legitimatized the children of such marriages; "provided, however, that such marriages shall be celebrated within six months from the passage of this law; and provided further, that no legal bar exists to such marriage." (Hart. Dig., art. 2438.)

Laws concerning polygamy were passed December 21, 1836, June 5, 1837, and December 18, 1837, which rendered a person in Mrs. Page's condition, under the facts as shown in the record, guilty of an offense up to the time of Page's divorce on the 11th day of May, 1840. (Hart. Dig., arts. 2706–2708.)

Up to this last date there was a legal impediment to her marriage with Potter, and therefore it was void. She rebuts the presumption of a legal marriage having been celebrated in fact after that time by her own evidence, wherein she states that she and Potter were never married otherwise than by bond. It was found, it may be presumed, that there were cases that the laws had not adequately provided relief for, and consequently on the 5th of February, 1841, another law was passed, which is as follows, to wit: "That whereas many persons heretofore, previous to an act approved June the fifth, eighteen hundred and thirty-seven, regulating marriages and for other purposes, had, for the want of some person legally qualified to celebrate the rites of matrimony, resorted to the practice of marrying by bond, and others have been married by various officers of justice not authorized to celebrate such marriages, and whereas public policy and the interest of families require a legislative action on the subject: therefore all such marriages are declared legal and valid to all intents and purposes, and the issue of such persons are declared legitimate children, and capable of inheritance." (Hart. Dig., art. 2448.) By a previous law of 28th February, 1840, to reg-

ulate the descent and distribution of intestates' estates, it was provided that "the issues also in marriages deemed null in law shall nevertheless be legitimate."

It is contended by counsel for appellants that this law of 1840 and 1841 should be understood to apply to such marriages by bond alone as was made when there was no legal impediment, and to be efficient for relief in such cases whether the parties had, in pursuance to the former law, got married legally in six months or not. So limited a construction may be doubted, as there were families here, as shown by cases in our reports, that continued to live many years, accumulating property and having children, when a former husband or wife was still living here or elsewhere, and it was the policy of the government to recognize the family here as entitled to the property which they had aided to accumulate. (Carroll *v.* Carroll, 20 Tex., 742, 746.) But if we give these laws the broadest scope of construction in reference to the marriages under bond as healing acts, they cannot be held to have created a marriage against the consent of the parties which was never intended by them or either of them. A marriage is a mutual agreement of a man and woman to live together in the relation and under the duties of husband and wife, sharing each other's fate or fortune for weal or woe until parted by death, which, in organized society, is subject to certain impediments, and legalized by compliance with certain forms of law. The relation itself is natural; the prescribed impediments and the forms of laws for its legal consummation are artificial, being the work of government. What was known as and called "marriages null in law" was a real marriage according to nature, and so intended by the parties, deficient only by the existence of some legal impediment or the want of compliance with the forms of law in contracting it. Our laws relieved against the impediment and the want of legal forms, but did not make an attempt to make concubinage marriage. The true question then in this case is,

the impediment and the forms of law being relieved against, did this natural relation of marriage exist in good faith between Potter and Mrs. Page during the time they lived together, from September (when she says they entered into bond) until Potter's death in March, 1842, nearly six years, or was their living together a merely conventional arrangement for illicit intercourse and mutual assistance in living, she being the willing mistress and he the protecting paramour?—as it is evident their association and relation commenced in Galveston in the spring of 1836, and continued in Shelby county, (afterwards Harrison,) in Texas, up to September of that year.

In the case of Sapp *v.* Newson the following language is used in relation to this subject, which, it is believed, announces the correct rule in reference to bond-marriages of the early times in Texas, to wit: "We think it the duty of the courts, upon the highest considerations of public policy, that the marriages contracted in those times should be regarded as mere civil contracts, and should be sustained as valid whenever the consent of the parties and the intention to enter into the state of matrimony, and to assume its duties and obligations," is clearly shown. .(27 Tex., 540.)

Is such a marriage in good faith shown clearly by the evidence in this case? Without discussing the evidence minutely, it is proper to consider that the terms of the alleged bond are not specified, or it spoken of as ever having been seen or heard of but by the defendant, who is contradicted in many other respects by numerous witnesses; that the evidence of recognition and common repute to establish a marriage is conflicting, and more easily reconcilable against than for it, when viewed in the light of the attendant circumstances and the history of the times; that she, a married woman with two children, having a father for a protector, in the absence of her husband, who was in the army under General Houston, should submit to the protection of Colonel Potter in an illicit association with him, and

thus go off with him into a remote part of the country ; that Colonel Potter, as shown by the evidence, had been a midshipman in the navy of the United States, had suffered imprisonment for more than two years in the State of North Carolina for the commission of an offense of an extraordinary character against two persons, which, throughout the whole Southern States, made him notorious and gave to the newly-coined word "Potterizing" a terrible significance ; his wife had been divorced from him on account of his said offenses and his treatment of her ; he had come to Texas, engaged actively in its struggle for independence, and was appointed Secretary of the Navy, and while in command took her on board of his ship ; his protestation to his old acquaintances that he never would marry any woman ; their failure to marry after Page's divorce removed all obstacle ; his naming her in his will as Mrs. Harriet A. Page, and giving her a portion of his property by that name ; her acquiescence in the probate of his will, and her recognition of Smith's executorship, which treated her as Mrs. Harriet A. Page, and not as Mrs. Potter ; when all these things, with many others tending to the same conclusion, are maturely considered, it can hardly be held that it has been clearly shown that a real marriage in good faith has been established, as the facts appear in the record.

It is contended that she was informed and believed that her husband, Solomon Page, was dead when she entered into bond-marriage with Potter, and that, as to her and her children, that fact fixes the legitimacy of their relation as wife and heirs of Potter, whatever he may have designed as to their relation. A case might occur, under the rules of law decided by this court, where a marriage took place in this country, and the husband had a wife living, of which the woman that he last married was ignorant, and remained so until his death, and she and her children be held to be, as to the effects here, the lawful wife and heirs. (Smith *v.* Smith, 1 Tex., 621 ; Carroll *v.* Carroll, 20 Tex., 731.)

So where a woman, who had separated from her husband who had not been heard of for five years, married another man, in the absence of actual proof that the former husband was alive, the presumption of innocence on her part will outweigh that of the continuance of his life, and she was held to be the lawful wife of the man last married. (Lockhart *v.* White, 18 Tex., 110.)   All such cases contemplate a real marriage, except some legal impediment or want of the forms of law which have been relieved against by our law.   In this case it was not shown that she had heard that her husband was dead when the illicit intercourse first commenced, and it is shown that she and Potter knew that Page was alive and suing for a divorce, which was obtained in 1840, and with that knowledge they did not change their relation, as it previously existed, while Potter lived, either by separating when they found they were living together illegally, and then even criminally, or by a legal marriage after the divorce was procured in 1840, and the legal impediment was thereby removed.   The laws of the Republic before that time had furnished officers in every county with ample authority to solemnize the rites of matrimony, and this opportunity existed for nearly two years before Potter's death, and still they lived together as they had done from the first.

It is contended, also, that she is entitled to a community interest in this property, it being part of the headright of Robert Potter, because she and her children constituted the family by which he was enabled to get a headright of a league and labor of land as the head of a family, instead of a third of a league as a single man.

The evidence fails also to support this claim.   Potter is shown to have had two children then alive in North Carolina, and West, a witness, proves that it was by that family that Potter claimed and obtained the original certificate from the land board, and that was not inconsistent with the practice, which has since been sanctioned by judicial

authority. (Russell's Heirs *v.* Randolph, 11 Tex., 460 ; Republic *v.* Young, Dallam, 464.) That is confirmed by the charge of Judge Hansford, on the trial in the District Court, establishing the certificate of Potter, (because it had not been reported as a valid headright for patenting,) by his telling the jury that proof that a citizen was the head of a family at the date of the declaration of independence raises no presumption that the citizen's family was in Ohio, Pennsylvania, Virginia, or North Carolina at such period. The evidence of Judge Amos Morrill, in reference to that trial, is rather a conclusion of what he thought must have taken place than a statement of facts professed to be recollected or known. Indeed it is not shown that Potter had ever seen Mrs. Page on the 2d of March, 1836, and there is nothing in the record to induce the belief that he had any reference to her and her children when he swore, as he had to do, that he was the head of a family in applying for his headright certificate, or that at the trial in the District Court of Red River county, to establish the same, he sought to maintain his claim by imposing upon the court and jury such a falsehood.

This case does not come within the principles announced in the cases of Yates *v.* Houston, 3 Tex., 433, and Babb *v.* Carroll, 21 Tex., 765, where the wife in Texas was the family that caused the increased quantity of land to be obtained, and was therefore held as having the better right against the children of the first wife, the legal one, left in Ohio, and who never came to Texas.

The question of marriage, in its different aspects, has been examined at length somewhat, not so much in reference to the rights which a valid or legalized marriage would have conferred upon Mrs. Ames and her children by Potter as lawful widow and heirs, as in reference to her rights under the statute of limitations, which will hereafter be briefly considered.

Though the will may have been in derogation of the

rights of the wife and of her children as his forced heirs, the will having been probated and standing for eighteen years unimpeached and in full operation as a valid disposition of the community property of which he died possessed, she cannot set up a claim adverse to it, either for herself as surviving widow, or for her children as forced heirs. (Anderson *v.* Stewart, 15 Tex., 285; Paschal *v.* Acklin, 27 Tex., 173.)

The will professed to convey all of Potter's property, without mentioning her as his wife or her children as his also; and being probated, it disposed of the property in controversy that had not been previously conveyed to her by deed, which must be respected as legal until the will or the probate of it is set aside by a direct proceeding for that purpose, and not collaterally, as here attempted.

The action of the County Court in Bowie county, in granting letters of administration upon Potter's estate in 1845, and afterwards in directing a partition without any notice to parties interested, ignoring and disregarding the provisions of the will, cannot be held in any degree to affect Mrs. Mayfield's right to the property under the will. ·She was no party to that partition. It was made in utter disregard of the probated will and of the proceedings of Smith, as executor under it, without any proceeding to attack any of them, and when those proceedings were filed in the County Court of Bowie county, on the very day that an order was made that letters of administration of Potter's estate should issue to Charles Ames, and had been transmitted there from the County Court of Red River in pursuance of a statute requiring it, on account of having given to Bowie County Court jurisdiction of estates that pertained to what was previously known as a portion of the southern division of Red River county and previously as part of Paschal county. There is no law, precedent, or authority known that would justify such a conclusion. It might also be difficult to find authority directly in point against it, for the reason that it

may be that such a proceeding, so devoid of legal authority, was never attempted to be carried out, as was done in this case. Whatever effect it might have in settling the respective rights of Mrs. Ames and her son John, supposing they had any in this property, it was not a proceeding to set aside the will or its probate so as to affect the rights of Mrs. Mayfield (who was then alive) secured by the will probated, and standing in full force in 1847 when the partition was ordered by the County Court of Bowie county, and to which she was not made a party or otherwise legally notified of.

5th. Did Mrs. Harriet A. Ames acquire a right to this land, or any part of it, by the statute of limitations of three, five, or ten years?

The main facts in relation to that question are, that she has remained in possession of Potter's residence and farm, situated on the land in controversy, from the time of his death up to the date of the institution of this suit. The administrators, Ames and Gordon, in 1842, returned an inventory, in which this land was returned as community property. She states that she told the executor, Smith, when he came to have the property appraised, that she claimed half the land ; and her son, William Ames, testified that he was twenty-seven years of age, and that his mother had claimed the place where she lived as long as he could recollect. Mrs. Mayfield remained a *feme covert* until her death, in the spring of 1852, and this suit was brought in less than ten years thereafter, to wit, on the 4th of July, 1857. The order of the County Court of Bowie county at the July Term, 1847, directing the partition previously ordered, together with her petition therefor, to be recorded and filed, was recorded in the county of Cass, where the land lay, on the 28th of February, 1853, and the order of Cass County Court, at the May Term, 1853, confirming the said partition *nunc pro tunc*, (then for the July Term, 1847,) does not appear to have been recorded in Cass county at all, otherwise than

in the County Court proceedings. If this order of partition, made as it was, could be held to stand in place of a deed, it was recorded less than five years from the date of the bringing of this suit.

This brings us to the consideration of what is deemed the main and important question on the statute of limitations of three years, under title or color of title, claimed to be supported by the legal effect of this order of partition that has been referred to. This claim of right is not based upon her being shown to have been Potter's lawful wife by other evidence, but upon her being conclusively made to have been his lawful wife, as to the property set apart for her as his surviving widow by a decree of a court of competent jurisdiction, which has not been appealed from or otherwise set aside, which it is contended would give her at least color of title sufficient, with her adverse possession, to maintain her right to the land so set apart to her under the three years.

This rests on the principle that she was adjudged to be entitled to the land set apart to her as his widow, the fact that she was his wife being a part of the adjudication. No reason is shown in the record why such an order should have been made in Bowie county at the May Term, 1847, when Cass county, including the subject-matter of this administration, was created more than a year before the first order by an act of the 25th of April, 1846. (Paschal's Dig., art. 309.) The petition of Mrs. Ames, joined by her husband, Charles Ames, seeks, as the widow of Robert Potter, to have her community interest in his headright league of land set apart to her as her distributive share thereof, and "prays that Robert W. Smith, who is the only person interested in said estate as executor of the last will and testament of the said decedent, be summoned to appear at the next term of the Probate Court for said county of Bowie to show cause, if any he have, why a writ of partition to be directed to certain commissioners to be appointed by your

honor should not issue; also that your honor will decree a partition of said estate, and that her distributive share of said estate be set off and assigned to her.'' This appears to have been filed 22d of May, 1847, and at the May Term, 1847, (the day not stated,) the following judgment entry was made, which, however, is only found in this record writ, issued to the commissioners, to wit:

"HARRIET AMES AND CHARLES AMES
        *vs.*
    ROBERT W. SMITH.

"This case coming on this day upon the bill exhibited by the plaintiff, and the defendant having made no answer, it is adjudged, ordered, and decreed by the court that a partition be made of said estate in accordance with the prayer of the petitioners, and that the clerk issue a writ of partition directed to Stephen Peters, William Browning, and J. H. McRunnels, who are appointed commissioners to divide said estate and make due return to this court of their acts and proceedings in this behalf.''

The commissioners made a return that they had set apart one-half of the land, including the homestead, to her, and the other half to her son, John Potter, who had not been mentioned before, either in the petition or order. At the July Term, 1847, it was ordered that ''the report of partition of the estate of Robert Potter, deceased, be recorded and filed.''

On the 30th of May, 1853, Mrs. Ames and her husband filed a petition to the County Court of Cass county, stating that at the May Term, 1847, an order was made for the partition of the community property of the said Harriet, the widow of Robert Potter, deceased, and the said Robert, and that the report of the commissioners was confirmed but neglected to be entered, and praying for a judgment of affirmance *nunc pro tunc*. This was done as requested, by a judgment entered at the May Term, 1853. There were no parties cited, and none appeared.

The partition only extended to the league of land, though her petition stated that there was other community property.

The original petition for partition in its terms seems to be founded upon the probate law of 1840, sec. 37, authorizing any one entitled to a distributive share of an estate to apply to the court for partition. This statute required service on interested parties, calling them defendants, and providing that if they did not appear when cited by personal service or publication, guardians *ad litem* should be appointed for them. (Hart. Dig., arts. 1031, 1033.) This power was taken from the court by a repeal of the law and the enactment of a law in 1846, which provided "that after the payment of debts and expenses, and after due notice given, as provided in the 17th section of this act, of the distribution of the estate, the same shall be distributed, under the direction of the judge, to the parties legally entitled thereto." The notice required in the 17th section was, "citation shall issue and be personally served on the heirs and legatees, and if minors, on their representatives, and on the occupants of the land living in the county." (Hart. Dig., arts. 1099, 1106, 1108.)

When this application for partition was made, Robert Potter's will, the probate of it, and all the proceedings relating to Robert W. Smith's executorship, including his resignation and discharge, were and had been filed in the County Court of Bowie county, from the 24th of November, 1845, as shown by the file-entries on the records in this case, by which it is obvious that the devisees and legatees were well known; and it also affirmatively appears that no citation was sought, except against Smith, who had no interest whatever, which appeared from the records of the court. The entry of the judgment, in its terms, shows that it was a proceeding against him and him alone, and that it was not an adjudication of her rights as surviving widow as against the devisees and legatees named in Potter's will, and did not, therefore, bind or conclude them.

She cannot, therefore, derive any aid from it in making out a title or color of title under the three years' limitation in this suit. (Lockhart *v.* White, 18 Tex., 111.)

There are many subjects incidently involved that have not been referred to. The exceptions to the answers have not been discussed. It may be said that if the facts, and those only, of each distinct defense had been distinctly and separately presented in the answer, instead of an oft-repeated running history of events, embracing facts applicable to several defenses, the case might be tried with much more certainty of arriving at correct results, especially in a case requiring, as this does, nearly four hundred pages of writing to contain the pleadings, evidence, exceptions, and judgment.

The points discussed are sufficient, with the views presented on them, to determine the case, and to hold that the judgment of the court below is erroneous.

REVERSED AND REMANDED.

[Associate Justices MOORE and REEVES did not sit in this case.]