LOUIS DEFFERARI ET AL. V. DOROTHY G. TERRY ET VIR.

No. 6714. Decided December 9, 1936.
Rehearing overruled January 20, 1937.
(99 S. W., 2d Series, 290.)

522

*Stewarts, Maco Stewart, W. Noble Carl,* and *Byron Economidy,* of Galveston, *Samuel Peterson,* of Houston, and *Ocie Speer,* of Austin, for plaintiff in error.

The undisputed evidence showed, as a matter of law, that the relationship between Gus Defferari and defendant in error's mother was illicit and a mere meretricious union between them and that they were never married. Berger v. Kirby, 105 Texas, 611, 153 S. W., 1130; Estate of Albert H. Peters, 73 Colo., 271, 215 Pac., 128; James v. James, 253 S. W., 1112; United States Fid. & Guar. Co. v. Henderson, 53 S. W. (2d) 811.

The statutes declaring that the issue of marriages deemed null in law shall nevertheless be legitimate, does not apply to so called common-law marriages. R. S., 1925, Art. 2581; McChesney v. Johnson, 79 S. W. (2d) 658; Dalrymple v. Dalrymple, 161 Eng. Reprint, 665; Cheseldine v. Brewer, 1 Harr. & McH., 152; Western U. Tel. Co. v. Proctor, 6 Texas Civ. App., 300, 25 S. W., 811.

*John H. Snell, Kenneth H. Aynesworth, Jr.,* and *E. H. Cavin,* of Houston, for defendants in error.

The term "marriage deemed null in law," as used in the statutes, contemplates any actual marriage and a common-law marriage, void because bigamous, is sufficient if entered into in good faith by one of the parties. Hartwell v. Jackson, 7 Texas, 576; Sisney v. Sisney, 132 Okla., 90, 269 Pac., 349; Pinkard v. Pinkard, 252 S. W., 265.

MR. JUDGE TAYLOR delivered the opinion of the Commission of Appeals, Section B.

This is a suit by Gussie Terry to recover from the four children of Frank Defferari, plaintiffs in error, a one-fifth interest in lands held by them under the will of their grandmother, Louisa Defferari. The grandmother as testatrix bequeathed the lands in question to her grandchildren. Mrs. Terry claims to come within the terms of the will as a legitimate child of Gus Defferari, a brother of Frank. Her suit, in which she is joined pro forma by her husband, is for a one-fifth interest in the lands that passed under Louisa's will, it being conceded that the four children of Frank, who were made defendants, are the only other grandchildren of the testatrix.

Plaintiffs in error will be referred to herein as the Defferaris, and defendant in error, Mrs. Terry, will be referred to by name.

The trial court denied the motion of the Defferaris for an instructed verdict, and rendered judgment in favor of Mrs. Terry and her husband. The Court of Civil Appeals affirmed the judgment. 68 S. W. (2d) 253.

The jury by its verdict found, (1) that Mrs. Terry's parents prior to her birth agreed to become husband and wife, (2) that pursuant to the agreement they lived together as such, and (3) that during such time they held each other out to the public as husband and wife.

It was upon the foregoing findings that the trial court rendered judgment, overruling the Defferaris' motion for an instructed verdict. The motion should have been granted if the evidence was *legally* insufficient to establish Mrs. Terry's claims of legitimacy. Doubt that the evidence was legally sufficient to show the child was legitimate was expressed by the court in granting the writ.

Mrs. Terry's claim that she was the legitimate child of Gus Defferari, and hence the legitimate grandchild of the testatrix and competent to take under her will as such, is predicated upon the second provision of Article 2581, R. C. S.

The article referred to is brief, having just two provisions. Only the second is invoked. Since it is necessary in construing the second that it be considered in connection with the first, both for convenience will be set out in full.

The first reads:

"Where a man, having by a woman a child or children, shall afterward intermarry with such woman, such child or children, if recognized by him, shall thereby be legitimated and made capable of inheriting his estate."

The second reads:

"The issue also of marriages deemed null in law shall nevertheless be legitimate."

The first provision of the article above quoted is not relied upon to support Mrs. Terry's claim of legitimacy. Under its terms legitimation is brought about by the parties themselves by means of a valid marriage, and it is admitted that the parents, Eula Beck and Gus Defferari, were not competent to enter into a valid marriage on account of an impediment which existed on his part. Stated concretely Mrs. Terry contends that under the findings of the jury it is established that prior to her birth a relationship constituting within the purview of the second provision of the statute a marriage deemed null in law was entered into by her parents, and that by operation of law her status as a child of such relationship is the same as to legitimacy as if her parents had been lawfully married.

In order to make clear the precise question presented for decision it is necessary to state generally but briefly some of the facts upon which Mrs. Terry relies as bringing the relationship of her parents within the purview of the statute, together with the holding of the Court of Civil Appeals with respect thereto.

It is undisputed that at the inception of the relationship assumed by the parents and throughout its continuance an impediment existed to the consummation of a valid marriage between them. Two or three years before Gus met Eula he married Bella Brown from whom he did not procure a divorce until after he and Eula ceased living together. No claim is made by Mrs. Terry that prior to her birth Gus and Eula entered into a vilad marriage either ceremonially or at common law. Her contention is that although the attempted marriage was not valid in law it was such as would have constituted a common-law marriage had it not been for the impediment thereto on her father's part of which her mother was ignorant,

and that she as the "issue" of such marriage "is nevertheless legitimate." Stated more concretely Mrs. Terry's claim of legitimacy is predicated upon the theory that her father and mother entered into a real marriage, so intended at least by her mother, lacking in validity only because of the legal impediment on the part of her father. She claims that the marriage intended by her parents was a real marriage at common law, and that they fully complied with its requisites as to form.

The Court of Civil Appeals in accepting this theory and in construing the findings of the jury to mean there was such compliance on the part of the parents, states that Mrs. Terry "was not born clear out of wedlock," but under the affirmative findings of the jury, was born "to a union that had all the form and requisites of a marriage at common law; that there was such good faith intention on Eula's part in making what the jury found to be a mutual agreement between her and Gus to become husband and wife and in thereafter living and cohabiting together as such, as to constitute a "marriage" within the statute.

The Court of Civil Appeals states in this connection that the precise interpretation of this provision of the statute "does not seem to have heretofore been announced by a Texas appellate court"; and in indicating its sweeping effect refers to the early case of Hartwell v. Jackson, 7 Texas, 580, in which the court is quoted as saying that its language legitimates the issue of "marriages deemed null in law without regard to the grounds of nullity * * *."

■ The two provisions of the article above quoted are supplemental. It is clear from the language of the first that regardless of what the relationship of the parents had been prior to the birth of the child, they, if capable of thereafter entering into a valid marriage, could render it legitimate by so doing.

It is equally clear from the language of the second that the nature of the relationship of the parents of which the child is declared the legitimate issue, is vital. Legitimation under the terms of this provision results from legislative declaration, and not from the subsequent acts of the parents after the child is born. The nature of the relationship from which legitimacy is declared is indicated by its use of the restrictive term "marriage"; and while the relationship is unlawful it is nevertheless worthy to be designated by the legislature as "marriage" notwithstanding it is "deemed null in law."

It is manifest that the legislature by the language of the

first provision makes available to the parents the means of legitimating a meretricious relationship, and by the language of the second declares legitimate the issue of a relationship designated as a "marriage deemed null in law."

The case turns upon whether the relationship between Gus Defferari and Eula Beck is comprehended within the foregoing statutory designation. If not, her suit must fail.

A brief history of Article 2581 and other legislative enactcents relating to legitimacy and marriage in connection with the conditions leading to their enactment, will aid in determining in general the legislative intent and meaning underlying the use of the term in question.

The article was enacted in 1840 practically as it now reads as a section of a descent and distribution act. Gammel's Laws of Texas, Vol. 2, p. 309. Prior thereto the Decree of January 16, 1836 (Hartley's Digest, Art. 2435), took recognition of bond marriages, and provided among other things that all marriages theretofore celebrated by bond or otherwise under the theretofore existing law, were "in like manner" declared valid on the conditions stated in the decree. The following year, 1837, the Congress of the Republic (Hartley's Digest, Art. 2436) made provision for validating void marriages and legitimating the children thereof in the following language:

"Whereas in many parts of Texas no person legally authorized to celebrate the rites of matrimony has existed; and whereas, from that cause, many persons have resorted to the practice of marrying by bond, and others have been married by various officers of justice, not authorized to celebrate such marriages; and whereas, public policy and the interest of families require some legislative action on the subject; Therefore,

"Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, that all persons who have so intermarried be, and they are hereby authorized to go before any of the persons hereinafter provided for, and publicly solemnize the rites of matrimony and all marriages so solemnized are hereby declared of legal and binding effect, from the period the persons had previously married agreeably to the custom of the times; and the issue of such persons are hereby declared legitimate children; provided, however, that such marriages shall be celebrated within six months of the passage of this law and provided, further, that no legal bar exists for such marriage."

The same act provided further that in cases where persons

had intermarried "agreeably to the customs of the country" and either parent had died prior to the passage of the law, such marriages were legal and the issue thereof was declared legitimate, provided the parents "lived together as man and wife *at the said death of either party.*" (Italics ours.)

In the case of Sapp v. Newsome, 27 Texas, 540, the court recognized without the aid of either the decree of 1836 or the act of 1837, the validity of bond marriages entered into as early as 1830. The court after pointing out that the conditions in that year were such as to render it impossible for the inhabitants to celebrate marriages according to the forms prescribed by the church without going beyond the limits of the province and traveling to distant points where ministers of the established religion could be found, says:

"We think it is the duty of the courts, upon the highest consideration of public policy, to hold that the marriages contracted in those times should be regarded as merely civil contracts, and should be sustained as valid, whenever the consent of the parties and the intention to enter into the *state of matrimony,* and to assume its duties and obligations, *is clearly shown.*" (Italics ours.)

An act unconditionally declaring bond marriages legal and declaring the issue thereof legitimate was approved in 1841 (Gammel's Laws of Texas, Vol. 2, p. 640) and later became what is now Article 4608, R. C. S., 1925. The marriages thereby legitimated are designated as those "marriages celebrated agreeably to the custom of the times," which occurred prior to the passage of the act of 1837.

The act of 1870 (Acts. 1870, p. 127, G. L., Vol. 6, p. 301) relating to the cohabiting of slaves (now Article 4609, R. C. S.), provides that those persons who had theretofore lived together as man and wife and were by the laws of bondage precluded from marrying, *and continued to live together until the death of one of the parties,* should be considered as having been legally married, and the "issue of such cohabitation" was declared legitimate.

■ It will be noted that the impediments to lawful marriage in none of the legitimation statutes were due to the acts of the parties, but rather to such matters as are indicative of good faith on their part in attempting to live together in a state of matrimony.

The decisions of other states construing their legitimacy statutes employing the term "marriage deemed null in law"

throw additional light on its meaning, since all statutes employing the term appear to have been patterned after the Virginia Act passed in 1775 at the behest of a committee headed by Thomas Jefferson. The decisions however are not free from conflict. The subject is dealt with fully in an annotation in A. L. R., Vol. 84, p. 499, under the heading "What constitutes a marriage within the meaning of a statute legitimating issue of all marriages null in law." The cases are collated and classified under the sub-headings, bigamous marriages, incestuous marriages, meretricious cohabitation and miscegenous marriages. In some of the cases dealing with bigamous, incestuous and miscegenous marriages the question of good faith on the part of at least one of the parties plays a prominent part in determining the question of legitimacy, but in others it does not appear to have been specifically considered. The discussion under the sub-heading "Meretricious Cohabitation" is prefaced with the following statement:

"A meretricious cohabitation where there was never any kind of a marriage, either ceremonial, statutory, or common law, does not constitute a 'marriage' within the meaning of a statute legitimating the issue of all marriages null in law, so that the chldren resulting from such relationship are not legitimated by the statute, but are the mere progeny of illicit intercourse."

Among other cases cited in support of the preface are Evatt v. Miller, 114 Ark., 84, 169 S. W., 817, and Stripe v. Meffert, 287 Mo., 366, 229 S. W., 762.

The case first cited is the principal case relied upon by counsel for Mrs. Terry in support of their contention that the Legislature by the enactment of the second provision of Article 2581 intended to legitimize the issue of all marriages deemed null in law *regardless of the cause or ground of the nullity*. The case is relied upon largely by the Court of Civil Appeals in support of its conclusion that the relationship between Gus and Eula is within the second provision of the article and is copiously quoted from by the court. It is not necessary, however, to detail the facts of the case or to discuss the holding of the court further than to state that the mother of the child in question was found to have entered into a ceremonial marriage with its father, who led her to believe before the ceremony was performed that he was divorced from her sister; and that the court in holding this marriage to be within the provision of a statute similar to all intents and purposes to the provision here under consideration, took pains to say that the statute

*"does not apply to the mere progeny of illicit intercourse, nor to the children born of persons whose relationship is merely that of persons who are illegally cohabiting together as man and wife."* (Italics ours.)

The case of Stripe v. Meffert, supra, is peculiarly helpful in ascertaining the meaning of the provision of the article herein invoked for the reason that the court construed together and as supplemental the two sections (341 and 342) of the State code of Missouri similar to all intents and purposes to the two provisions of article here involved.

The material facts are that Frederick Meffert Stripe sued as the issue of an unlawful marriage between Dr. Joseph Meffert and Anna Stripe to quiet title to real estate claimed by the legitimate heirs of Dr. Meffert. The jury found there was a marriage between Meffert and Anna and that Frederick was the issue of the marriage. It was undisputed that she had a living undivorced husband at the inception of her relationship with Meffert and throughout the period they lived together as man and wife and that she knew it.

Section 341 of the Code reads:

"If a man, having by a woman a child or children, shall afterward intermarry with her, and shall recognize such child or children to be his, they shall thereby be legitimated."

Section 342 reads:

"The issue of all marriages decreed (deemed) null in law, or dissolved by divorce, shall be legitimate."

Section 342 was invoked by Frederick in that case as was the second provision of Article 2581 in this case, but he was denied the relief sought. Eliminating the clause of the second section relating to divorce, and treating the term "decreed" there used as if the term "deemed" was intended, there is no material difference between the two sections of the Code and the two provisions of our own statute either in scope or meaning.

The court in concluding that section 342 governs when there is a bona fide marriage of which the child is the issue, say:

"These two sections must be read and construed together; they supplement and complement each other. When so read one (section 342) covers the case where there was a marriage between the parents, but it would be decreed null in law. There can be no marriage without a bona fide intention to marry in compliance with the law of the state where the marriage is contracted, because marriage is a legal relation, and if the intention of the parties to it is to form a relation contrary to or

in defiance of the law, they can have no intention to enter into a marriage at all. It frequently happens that parties in good faith intend to marry in compliance with the law — to form a legal relation — but it turns out that some fact exists, not within their knowledge at the time, which renders such marriage null and void in law, such as one or both of them having another spouse from whom they erroneously supposed they were freed by death or divorce, or they were related within the prohibited degrees of consanguinity, or other impediments of which they were ignorant, existed which rendered their marriage void. In all such cases, there would be a marriage which would be decreed null in law, to which said section 342 would be applicable, and the issue of such a marriage would be legitimate thereunder. But section 341 applies to cases where the relationship between the parties at the time the child was conceived was illegal and criminal, as to both parents, and in such case that section requires a subsequent legal marriage of the parents to make the children legitimate. Both sections were not intended to cover the same ground."

We are not put to the necessity, however, of looking beyond the decisions of this Court for a pertinent discussion of the meaning of the provision of the article herein invoked. In Lewis v. Ames, 44 Texas, 319, Chief Justice Roberts reviewed the legislative history of the early enactments of the republic and the new state on legitimacy and marriage, and stated the meaning of the term "marriage deemed null in law" as applied to a state of facts somewhat similar to those here involved. The plaintiffs sued in trespass to try title to recover certain lands held by Mrs. Harriet Ames and her children, Mrs. Ames claiming the lands as the surviving lawful wife of Robert Potter for herself and her children by him. Chief Justice Roberts speaking for the court states one of the questions involved to be whether Mrs. Ames was legally the wife of Potter and whether her children by him were legitimate with reference to the land under the statutory provision involved herein. The trial court gave application to the provision rendering judgment for Mrs. Ames and the children.

The facts relating to the marriage pleaded by Mrs. Ames are that she and Potter met for the first time in 1836. His wife had been theretofore divorced. Mrs. Ames had a living husband, Solomon Page, from whom she was not at that time divorced. He later procured a divorce in 1842. Potter and Mrs. Ames were married by bond in September of the year they met, and lived together in the same house after the

manner of husband and wife before and after the time and until Potter's death in 1842. Besides the foregoing facts there were other facts that are thus referred to by the court:

"There was also evidence of mutual recognition and common repute, of which there is an immense amount, pro and con, in the record — some of it tending to show that they did not recognize each other as husband and wife, although they lived together and slept together; some of it tended to show that they did recognize each other as husband and wife. There was evidence tending to show that she heard and believed that her husband, Page, was dead shortly after she met Potter. Other evidence tended to show that after she was taken under Potter's protection her husband visited her for the purpose of procuring her return home, and she states that she was afterwards informed of his application for a divorce from her."

It is pointed out by Chief Justice Roberts that "these marriages in Texas, deemed null in law, were of such pressing consideration and consequences as to demand the attention of the Anglo-Americans even in the very first initiatory stage of their assumption of superior powers in Texas." After taking notice of the decree of 1836, and the act of 1837, supra, he says:

"It was found, it may be presumed, that there were cases that the laws had not adequately provided relief for, and consequently on the 5th of February, 1841, another law was passed, which is as follows, towit: 'That whereas many persons heretofore, previous to an act approved June the fifth, eighteen hundred and thirty-seven, regulating marriages and for other purposes, had, for the want of some person legally qualified to celebrate the rites of matrimony, resorted to the practice of marrying by bond, and others have been married by various officers of justice, not authorized to celebrate such marriages, and whereas public policy and the interest of families require a legislative action on the subject; therefore all such marriages are declared legal and valid to all intents and purposes, and the issue of such persons are declared legitimate children, and capable of inheritance.' (Hart. Dig., art. 2448.) By a previous law of 28th February, 1840, to regulate the descent and distribution of intestates' estates, it was provided that 'the issues also in marriages deemed null in law shall nevertheless be legitimate.' "

The court after stating the contention of counsel that the laws of 1840 and 1841 were efficient for relief as to the legitimacy of the children of Mrs. Ames by Potter, says further:

"But if we give these laws the broadest scope of construction in reference to the marriages under bond as healing acts, they cannot be held to have created a marriage against the consent of the parties which was never intended by them or either of them. A marriage is a mutual agreement of a man and woman to live together in the relation and under the duties of husband and wife, sharing each other's fate or fortune for weal or woe until parted by death, which, in organized society, is subject to certain impediments, and legalized by compliance with certain forms of law. * * * *What was known as and called 'marriages null in law' was a real marriage according to nature, and so intended by the parties, deficient only by the existence of some legal impediment or the want of compliance with the forms of law in contracting it. Our laws relieved against the impediment and the want of legal forms, but did not make an attempt to make concubinage marriage."* (Italics ours.)

The following excerpt from the opinion sheds light upon the court's view of the facts as constituting marriage, and its view of the holdings in Smith v. Smith and Carroll v. Carroll therein referred to:

"Is such a marriage in good faith shown clearly by the evidence in this case? Without discussing the evidence minutely, it is proper to consider that the terms of the alleged bond are not specified, or it spoken of as ever having been seen or heard of but by the defendant, who is contradicted in many other respects by numerous witnesses; that the evidence of recognition and common repute to establish a marriage is conflicting, and more easily reconcilable against than for it, when viewed in the light of the attendant circumstances and the history of the times; * * * he (Potter) had come to Texas, engaged actively in its struggle for independence, and was appointed Secretary of the Navy, and while in command took her on board of his ship; his protestation to his old acquaintances that he never would marry any woman; their failure to marry after Page's divorce removed all obstacle; his naming her in his will as Mrs. Harriet A. Page, and giving her a portion of his property by that name; her acquiencene in the probate of his will, and her recognition of Smith's executorship, which treated her as Mrs. Harriet A. Page, and not as Mrs. Potter; *when all these things, with many others tending to the same conclusion, are maturely considered, it can hardly be held that it has been clearly shown that a real marriage in good faith*

*has been established, as the facts appear in the record."* (Italics ours.)

"It is contended that she was informed and believed that her husband, Solomon Page, was dead when she entered into bond-marriage with Potter, and that as to her and her children, that fact fixes the legitimacy of their relation as wife and heirs of Potter, whatever he may have designated as to their relation. A case might occur, under the rules of law decided by this court, where a marriage took place in this country, and the husband had a wife living, of which the woman that he last married was ignorant, and remained so until his death, and she and her children be held to be, as to the effects here, the lawful wife and heirs. (Smith v. Smith, 1 Tex. 621; Carroll v. Carroll, 20 Tex. 731.)

"So where a woman, who had separated from her husband who had not been heard of for five years, married another man, in the absence of actual proof that the former husband was alive, the presumption of innocence on her part will outweigh that of the continuance of his life, and she was held to be the lawful wife of the man last married. (Lockhart v. White, 18 Tex., 110.) All such cases contemplate a real marriage, except some legal impediment or want of the forms of law which have been relieved against by our law. In this case it was not shown *that she had heard that her husband was dead when the illicit intercourse first commenced,* and it is shown that she and Potter knew that Page was alive and suing for a divorce, which was obtained in 1840, and with that knowledge they did not change their relation, as it previously existed, while Potter lived, either by separating when they found they were living together illegally, and then even criminally, or by a legal marriage after the divorce was procured in 1840, and the legal impediment was thereby removed. The laws of the Republic before that time had furnished officers in every county with ample authority to solemnize the rites of matrimony, and this opportunity existed for nearly two years before Potter's death, and still they lived together as they had done from the first." (Italics ours.)

■ While it may be assumed for present purposes that Gus and Eula agreed to enter into a marriage at common law after pregnancy occurred and the child was in being, and that pursuant thereto they lived together as husband and wife and during such time held themselves out as such, there can be no question under the facts before us as to the character of their prior relationship of which the child is the issue.

A brief statement chronologically of the facts leading to the making of the agreement makes clear when it occurred and the nature of their prior relationship.

Eula, called as witness for her daughter, related that her maiden name was Beck and that when about nineteen years of age she came from Mobile to Galveston accompanied by a lady friend; that on the second night after their arrival they met Gus and another man on the street who took them to Jesse Anderson's place, a house of ill repute on Post Office street; that he visited her there until he took her to Tremont street to a house owned by Gus' mother; that Gus lived there with her about two weeks when she became pregnant; that he was staying there with her when the child was conceived and she was not then having relations with any other man; that after she was pregnant Gus took her from Tremont street to 2603 Church street where she began housekeeping and where the child was born, seven or eight months later.

Whatever agreement was made by Gus and Eula with respect to living together as husband and wife was not made until after Eula moved to Church street. She was the only party to the agreement living at the time of the trial, Gus having died in 1916, and was the only witness who testified concerning it. At the time her testimony was given her surname was Miranda, she having married a soldier by that name at Texas City several years after she and Gus ceased living together.

The following excerpts from her testimony brought out on direct examination by her counsel for Mrs. Terry disclose beyond question when the agreement was made:

"Q: Now, where were you living when you became pregnant with Mrs. Terry?

A: 2603 Church street.

Q: 2603 Church?

A: Yes sir.

Q: Are you sure about that?

A: On Tremont St. when I first became that way."

* * *

"Q: Did you and Mr. Defferari ever have a formal marriage ceremony?

A: No sir.

Q: What sort of understanding did you all have?

A: Well, we just made it between us that we would live together that way."

"Q: I am driving at this: This agreement you had with him when you and he first moved into this house and started living together or when you all first started living together, whether on Tremont St. or whatever it was—

A: It was on Church St.

Q: (Continuing) what was said at the time you all agreed to live there?

A: Well, he bought the furniture and rented the house and we moved in there."

■ The foregoing facts told in the mother's own words are all that are disclosed by the record as to when she attempted to comply as to form with the first requisite of a real marriage, to wit an agreement to become husband and wife. The child was then already in being. The relationship of which it was the issue had theretofore been formed. It had its inception in meretriciousness which continued at least until after pregnancy, and was not such as to constitute marriage within the meaning of the provision of the statute declaring legitimate the issue of "marriage." This conclusion is inescapable in the light of the language of the provision, its history and the conditions necessitating its enactment into law. It does not purport to declare legitimate the issue of illicit relationships. As stated in Lewis v. Ames, supra, it does not "make an attempt to make concubinage marriage."

■ In view of what has been stated it is not necessary to determine the full scope and meaning of the statutory provision discussed. Its meaning has not been liberalized by reenactment as a part of subsequent codifications of the statutes, since all revisions by such means since 1875 when the opinion in Lewis v. Ames was written, including the revision of 1925 where the article in question now appears, have been adopted in the light of the meaning ascribed to it in that opinion, with no later decision of this court of contrary import, and with the conditions calling for the original enactment almost if not entirely eliminated. The laws passed by the Legislature since 1840 relating to legitimacy and marriage above set out and referred to, reflect not only a wholesome solicitude for innocent children, but an equally wholesome attitude toward the relationship of marriage, as well as an alertness to avoid the semblance of approval of illicit sexual relations. The decisions of this Court subsequent to Lewis v. Ames reflect a like solicitude as typified in the notable case of Grigsby v. Reib, 105

Texas, 597, 153 S. W., 1124, in which Chief Justice Brown speaking for the court, says:

"When the 'wedding day' of the parent ceases to be revered by the offspring there will be a weakening of the family ties and a lowering of the standard of marriage and home."

The facts as detailed make clear that the trial court erred in submitting to the jury the issues upon which its findings were made, and preclude any findings upon which a holding could be predicated that the relationship between the parents reflected by the testimony before us is within the statute.

It is not necessary to set out the facts concerning the relationship of the parents subsequent to the time of entering into the so-called agreement to live together as husband and wife. We doubt the legal sufficiency of the evidence relating to their relationship from its beginning until they separated to show a "marriage" was entered into by them *at any time* under the rule stated in Lewis v. Ames for determining the legal sufficiency of the evidence in such cases to show a marriage within the provision of the statute in question, towit that the evidence must *clearly show such marriage.* This, however, need not be determined, since the facts show as a matter of law that the relationship of which Mrs. Terry is the issue is not within the terms of the statutory provision invoked.

The trial court erred in not sustaining the motion of the Defferaris for an instructed verdict and in submitting to the jury the issues referred to, and the Court of Civil Appeals erred in affirming the judgment rendered on the findings thereon.

The judgments of both courts are reversed and judgment is here rendered that defendants in error recover nothing by their suit.

Opinion adopted by the Supreme Court December 9, 1936.

Rehearing overruled January 20, 1937.