## WRISTEN v. WRISTEN et al.
### No. 1816.

Court of Civil Appeals of Texas. Eastland.
June 29, 1938.

Rehearing Denied Sept. 23, 1938.

Crenshaw & Dupree, of Lubbock, and Scarborough & Ely, of Abilene, for appellant.

Carl Rountree, J. E. Garland, Louis B. Reed, and V. O. Key, all of Lamesa, for appellee.

LESLIE, Chief Justice.

John Wristen, a resident of Dawson County, died February 15, 1937, seized and possessed of considerable real estate and personal property, much of which was located in that county. Bert Wristen, a brother, applied for and was appointed temporary administrator of the estate. He alleged there was no necessity for a permanent administration, no minor heirs, etc., and that he was not disqualified to be appointed temporary administrator of the estate.

Soon thereafter, Mrs. Kate Wristen, acting for herself and as next friend for her son John, made application to be appointed permanent administratrix of said estate, alleging that at his death John Wristen was her lawful husband, and the father of her son John. She set out the names of the brothers, sisters, nieces and nephews of the deceased, and alleged they were all the surviving relatives and kin interested in the estate; and upon the ground that she was Wristen's wife, claimed a preference right to be appointed permanent administratrix and asked that the appointment of Bert Wristen be revoked. She alleged she was such wife by virtue of a common-law marriage, and that her son, John Charles, was the legitimate child of Wristen.

Bert Wristen individually, and as temporary administrator, joined by the brothers and sisters, etc., answered, contesting her right to be so appointed, and denying that she was ever the lawful wife of John Wristen and otherwise resisted her claim to be appointed permanent administratrix of the estate, etc.

Her application and prayer for appointment as administratrix came on to be heard in the County Court where the prayer was refused. She appealed to the District Court where a trial was had on pleadings in the nature of those indicated. At the conclusion of the trial the judge peremptorily instructed the jury to return a verdict against the plaintiff and in favor of the defendants. A judgment was entered accordingly and she prosecutes this appeal.

The appeal presents but one question to be decided and that is as to whether the testimony introduced by the appellant Mrs. Kate Wristen was sufficient to raise a fact issue to go to the jury as to whether or not at the .time of the death of John Wristen she was his wife by virtue of a common-law marriage.

■ If the evidence, taken in the light most favorable to the plaintiff, conclusively warranted an instructed verdict in defendants' favor, the judgment should be affirmed. 41 Tex.Jur. p. 949, sec. 177.

■ The correct test to be applied to the testimony in determining whether or not the parties have consummated a com-, mon-law marriage is fully discussed and applied in Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1, Ann.Cas. 1915C, 1011, in an able opinion by Justice Brown, wherein the following charge of the trial court was approved [page 1125]: "The court instructs you that a common-law marriage is legal and valid under the law of Texas; and neither the issuance of license or ministerial or official marriage ceremony is necessary to constitute a lawful and binding common-law marriage.¹ All that is necessary to constitute such a marriage is that if the parties mutually agree and consent together to become husband and wife, and thereafter carry out that agreement and live and cohabit together as husband and wife, the marriage would be valid under our law. If you find and believe from the evidence that the plaintiff and the deceased, G. M. D. Grigsby, on or about the 10th day of April, 1905, mutually consented and agreed together with each other to become husband and wife, with the intention at that time of living and cohabiting with each other as husband and wife, and that in pursuance of such agreement, if any, they did professedly live and cohabit together as husband and wife, you will find for the plaintiff that she was the common-law wife of the de-

ceased, G. M. D. Grigsby. If, however, on the other hand, you fail to find that plaintiff and deceased, G. M. D. Grigsby, mutually consented and agreed together with each other to become husband and wife on or about April 10, 1905, or if you find that plaintiff and deceased, Grigsby, did not professedly live and cohabit with each other as husband and wife in pursuance of such agreement, if any, you will find for the defendant, Eliza J. Reib."

At the time of handing down that opinion, the case of Berger v. Kirby, 105 Tex. 611, 153 S.W. 1130, 51 L.R.A.,N.S., 182, was decided and in referring to and citing Grigsby v. Reib, supra, the court said concerning that opinion [page 1131]: "The charge of the court gave a correct rule to govern the jury in deciding the issue of marriage."

■ In the interest of brevity, this opinion proceeds upon the theory that the appellant's testimony at least raised an issue of fact in respect to the alleged agreement between her . and John Wristen to take each other as husband and wife during the remainder of their lives. This is taking her testimony in that respect in the light most favorable to her, and except in a collateral way, or where the evidence on this phase of the case may have a bearing on the other issue in the case, the inherent weakness of the testimony pertaining to such agreement will not be referred to or discussed. It may, for the purposes of this opinion, be accepted as true.

The existence of such agreement alone is not sufficient to establish the status or marriage relation, as pointed out in the above authorities and those to follow. In addition, the proof must show that such agreement was followed by cohabitation and living together professedly as man and wife. Grigsby v. Reib, supra; Berger v. Kirby, supra; Schwingle v. Keifer et al., 105 Tex. 609, 153 S.W. 1132; Bull v. Bull, 29 Tex.Civ.App. 364, 68 S.W. 727; Consolidated Underwriters v. Kelly et al., Tex. Com.App., 15 S.W.2d 229; De Beque v. Ligon, Tex.Civ.App., 286 S.W. 749; Id., Tex.Com.App., 292 S.W. 157; Edelstein v. Brown, Tex.Civ.App., 95 S.W. 1126; Id., 100 Tex. 403, 100 S.W. 129, 123 Am.St. Rep. 816; Humble Oil & Refining Co. v. Jeffrey, Tex.Civ.App., 38 S.W.2d 374; Id., Tex.Com.App., 55 S.W.2d 521; Ingersol v. McWillie, 9 Tex.Civ.App. 543, 30 S.W. 56; McChesney v. Johnson, Tex.Civ.App., 79 S.W.2d 658; King v. King's Unknown

Heirs, Tex.Civ.App., 16 S.W.2d 160, reversed on other grounds, Tex.Com.App., 34 S.W.2d 804; Salvina v. Salvina, Tex. Civ.App., 2 S.W.2d 963; Texas Employers' Ins. Ass'n v. Soto, Tex.Civ.App., 294 S.W. 639; Defferari v. Terry, 128 Tex. 521, 99 S.W.2d 290; 28 Tex.Jur. p. 714, sec. 17, et seq.

As reflected by the testimony the general nature of the connection and association of these parties for more than twenty years will first be discussed. Specific portions of the appellant's testimony will then be referred to as conclusively showing that during such time they did not cohabit and live together professedly as husband and wife, which, as pointed out, is also essential to create the marriage status under the common-law. In McChesney et al. v. Johnson, Tex.Civ.App., 79 S.W.2d 658, it is said [page 659]: "The agreement is fundamental and cohabitation is an element, but the holding out to the public as being man and wife is the acid test." Obviously this is but stating in different language what Judge Brown said in Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124, L.R.A.1915E, 1, Ann.Cas.1915C, 1011, when he wrote [page 1130] "The cohabitation must be professed as husband and wife, and public, so that, by their conduct towards each other, they may be known as husband and wife."

According to Webster's New International Dictionary the word "profess" means "to make open declaration of, to make public declaration or avowal." The word "professed" means "openly declared, avowed, acknowledged or claimed." The meaning of the word "professedly" used by our Supreme Court, is "avowedly" and its accepted meaning and usage, as reflected by the context of the opinion, states precisely what the appellant and John Wristen did not say or do concerning their alleged marital relation.

◼ With the view of applying the above test, an examination of the testimony will now be made. When 14 years of age the appellant, then Kate Gillespie, moved in 1914 with her father and the family to Dawson County where he rented a farm from John Wristen's father. Here Kate soon became acquainted with John. It appears that he later became the owner of the farm, and in 1918 moved into a shack thereon about 100 yards from the Gillespie home.

In 1923 he rebuilt or added to the residence and moved into a room of the same. The Gillespies continued to occupy the residence. At that time John was about 38 years of age. According to appellant's testimony, he began making love to her about July, 1915, when she was 15 years of age. In time they discussed getting married and during her 16th year they began having illicit relations. The testimony is that he suggested that they would get married "later" and she says she yielded under such belief. That such illicit acts were thereafter repeated at "every chance." On August 11, 1923, concluding that John was not serious in his courtship, she married E. H. Miller and moved with him to Commerce, Texas, where she resided with him the major portion of the time until she returned about December, 1927, with the view, at that time, of permanently residing in Dawson County.

While married to Miller she made various visits to Dawson County where her family and John Wristen occupied the Wristen residence. Concerning the visit in September, 1924, she testified she "did not just come back on a visit to folks at that time"; that "John was wanting me to come home"; that "he sent me the money to come home." On this occasion she remained until January 1, 1925, when she returned to Commerce and remained there until the fall of 1925, when she again visited the folks in Dawson County, apparently at the instance of John Wristen. Referring to this visit she testified, "John wanted me to come."

On this occasion, as on all others, she stayed at the Wristen residence occupied by John and the Gillespies. During the time when here, and covering their associations together, she occupied a separate room in the house. Wristen occupied an adjoining room. There was a connecting door through which they had access to each other's rooms.

January 1, 1926, she again returned to Commerce where she remained with Miller until about August, 1926, when she returned with John Wristen and her folks, who then visited them at Commerce. During this visit the second Miller child was born, September 25, 1926. Six or seven weeks later she returned to Commerce and there remained until the fall of 1927 when, upon the report that her mother was ill, but in fact at the suggestion of John

Wristen to her mother and upon his money, she again returned to Dawson County. She remained there until about the second week in December, 1927 and again returned to Commerce for the purpose of collecting her things for removal to Dawson County, as above stated.

She testified that Miller moved with her; that on the return they resided for a short time at her "present home" and then moved to a nearby farm and remained there five or six weeks and then removed to a "shack" near the Wristen home where the family and John resided. Here they remained until the fall of 1928 when Miller, separating from her, went to Lamesa and there remained alone until May 1, 1929, at which time he departed permanently for east Texas. While at Lamesa he took the measles and she went there and waited upon him for about ten days, after which time she returned to the Wristen place, as aforesaid.

The appellant further testified that when Miller recovered from the measles he had no funds on which to travel and that she informed Wristen of Miller's circumstances; that Wristen (with uncomplimentary remarks toward Miller) said he would let him "have the money to leave on to get him out of the way." About $300 was so advanced and shortly thereafter Miller left. There is testimony that this advance was in the nature of a loan with some type of inferior security given by Miller, but that is immaterial here. After Miller's final departure the appellant continued to occupy the same room in the Wristen house as theretofore, and, as usual, Wristen occupied the adjoining one until on February 4, 1937 when he was carried to the sanitarium.

The appellant's testimony discloses that after Miller left on May 1, 1929, she never saw him again until the first or second week of March, 1937—nearly eight years. Her son, called John Charles Wristen in the pleadings, was born in Dawson County March 27, 1930, about eleven months after Miller left, and long before Miller obtained a divorce from her about February 1, 1936.

It will thus be seen that during the long period of time beginning with their first acquaintance in 1914 and extending to the date of her marriage to Miller, August 11, 1923, these parties did not avail themselves of the abundant opportunities to consummate any type or character of lawful marital relation. From the Miller marriage until the divorce in February, 1936, about 13 years, law and public policy forbade the establishment by these parties of any such lawful relation; but the appellant confesses that the same course of secret and illicit conduct continued during her marriage to Miller, as in the beginning, and throughout all her associations with Wristen.

She testifies that after the birth of her last child (of which John Wristen may be conceded to be the father) she had conversations with John about their getting married and giving the boy a name. Her language was, "I should get a divorce and be married. He said we would later." She also testified that after said birth and after the granting of the divorce, she had other conversations with reference to getting married and that he would reply "when my folks move out of the house." The testimony is to the effect that John called the boy "son", spoke of him as "our boy" and showed a parental affection and partiality for the child. So matters ran along with their relations and indulgences unaltered.

After the divorce (February, 1936) the Gillespies continued to occupy the Wristen house until January 3, 1937, when the mother and her other children moved out, leaving the house to the sole occupancy of John Wristen, Kate and her children. Fifteen days later, January 18, 1937, John Wristen was stricken with what proved to be a fatal illness. He was removed to a sanitarium February 4 and there died February 15, 1937. Although every legal barrier to a marriage recognized and dignified by law was again removed, yet, throughout this period of their association, subsequent to the divorce and terminated by John's death, the evidence discloses no intention upon the part of appellant and Wristen to live and cohabit together as man and wife; it refutes such idea. They did not professedly so present themselves to the public, but cautiously avoided doing so. Among others, the following conclusive facts and circumstances appear:

Taking as true that after the Miller divorce February, 1936, she and Wristen agreed to take each other as husband and wife and give the child a name, nevertheless, the following month, March 27, 1936, she swore to a rendition of her children to the school census taker, stating their names and ages, etc., and therein stated the name of the child involved in this litigation to

be Charles Miller, and her own, Mrs. Kate Miller. In this connection, while on the witness stand she was asked whether or not after the purported agreement with John Wristen (after the divorce), she told anyone that she and John "were married from then on out" as she stated they had so agreed. To this she replied: "No, we didn't have no talk.

"Q. Your supposed marriage was absolutely secret was it? A. (No answer).

"Q. Just want you to answer. It was kept a secret, was it? A. Yes.

"Q. And never was proclaimed publicly? A. No, because he didn't believe in being public."

Long after the divorce and the alleged agreement, John Wristen wrote a $7.50 check on December 14, 1936, payable to Mrs. Kate Miller, and upon her indorsement by that name it was paid the following day.

On July 8, 1936, her son John Charles was operated on for appendicitis and she appealed for assistance to the Red Cross as Mrs. Kate Miller. She testified that this was pursuant to the suggestion of John Wristen, who paid some of the expenses of the operation.

She also admitted on the witness stand that soon after the birth of her son John Charles on March 27, 1930, she wrote her husband at Commerce, saying, "We have another baby boy," and requested that he give it a name and he suggested Charles Adden Miller; that she so "recorded" the child's name, but that this also was done at the instance of Wristen.

She testified that she "worked out" more or less from 1929 till the death of John Wristen. That January 4, 1935, she registered as Mrs. Kate Miller for work with the WPA. That she worked until June 18, that August 27, 1936 (after the divorce) she returned to work for the WPA, again registering as "Kate Miller, a widow"; that John Wristen suggested that she so register. That 'during that time (after August, 1936) she was "living with John Wristen" as in the past. Under the name of Miller, and as an indigent widow, she continued to work for the WPA "off and on" from August, 1936, "until Friday before he (John Wristen) died Monday February 15, 1937."

In the meantime and generally as in the past, she worked about the Wristen household, washing, repairing his clothes, iron-ing and milking, etc. She testified that John's sickness did not cause her to give up her work at the WPA, but she missed two or three days; that he instructed her to "go back" to her work. She sat up with him one night and otherwise administered to him in his last illness. That while he paid some of the sanitarium and doctors' bills incurred by reason of her sickness and that of son Charles, she never received any compensation for what she did for John Wristen and did not expect any.

The appellant purchased and sent to John's funeral a spray of flowers to which was attached a card bearing the words: "With sympathy. Mrs. Kate Gillespie and Son Charles." She admits that in February after the death of John Wristen she for the first time wrote her name as "Mrs. Kate Wristen." On the witness stand she was unable to remember the name of any person whom she had told prior to the death of Wristen that she was his wife. Such is the general tenor of appellant's testimony.

Obviously the last state of these parties was no better than the first. If any difference, their conduct was a bit bolder and more callous in its flagrant disregard for the proprieties and amenities of orderly social life. There is no evidence to show a bona fide intent to raise their relationship from a clandestine, illicit association to the status of lawful wedlock.

Aside from the alleged agreement to take each other as husband and wife, the testimony presents only remote or isolated incidents or expressions tending to support appellant's contention that a common-law marriage was consummated. Much, if not all, of such testimony is completely discredited by the witness giving the same, or by the attending conclusive facts and circumstances. We are convinced that if there be found in the statement of facts any statement tending to suggest that these parties professedly lived together as husband and wife, etc., such suggestions and statements, if any, do not go beyond the point of creating a mere surmise or suspicion to that effect, and do not in "legal contemplation" amount to any evidence, as held in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

Further, as said by Justice Hickman in Southern Surety Co. v. Inabnit et al., Tex.Civ.App., 1 S.W.2d 412, 415, "The testimony of a party to a suit and

admissions made by him must be construed as binding upon him * * *." See authorities cited in that opinion, and Bailey et al. v. Hix, 49 Tex. 536.

The authorities cited by the appellant give effect to the same rules of law employed in the disposition of this appeal. The difference in the cases lies in the respective states of fact and not in applicable rules of law. In those opinions controlling facts, analogous to those in the instant case, are pointed out.

In Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229, it is stated: "Joe Kelly introduced her to his Beaumont friends as his wife, and she acknowledged him openly as her husband. They lived and cohabited as husband and wife, and received their friends in their home as such, and their friends recognized them as husband and wife." This conduct occurred at a time when no impediment to a lawful marriage existed.

In Edelstein v. Brown, Tex.Civ.App., 95 S.W. 1126, 1129, Id., 100 Tex. 403, 100 S. W. 129, 123 Am.St.Rep. 816, the opinion states some of the controlling facts in the case as follows: " * * * they did assume that relation and live and cohabit together as husband and wife for years, during which time they declared themselves as husband and wife, and were so known and recognized by their neighbors and friends."

In Bull v. Bull, 29 Tex.Civ.App. 364, 68 S.W. 727, the conclusion with reference to same character of the testimony is expressed thus [page 729]: "We find no evidence whatever to indicate that Bull at any time during his relations with appellant did otherwise than claim her as his wife, but to the contrary."

In Aldana v. Aldana, Tex.Civ.App., 42 S.W.2d 661, there was professedly a holding out as man and wife. Some of the evidence to that effect was an income tax return, stating the same to be a "joint return of husband and wife" [page 664]; that they were husband and wife the last day of the "taxable year" and appropriate exemptions under such circumstances were claimed.

In De Beque v. Ligon, Tex.Com.App., 292 S.W. 157, the testimony upon the element now under consideration in this case is illustrated by the introduction in evidence of "an instrument of adoption in which [the man and woman] are described as husband and wife" [page 157] when they executed it. There was a separate acknowledgment setting out the relation. This was evidence of the holding out to the public as man and wife, etc.

The authorities are uniform that the proof must show that the agreement to be man and wife must be followed "by cohabitation and living together professedly as man and wife" and it is believed to be unnecessary to refer specifically to additional authorities dealing with kindred states of fact relating to this second and essential element of common-law marriage. It is here that the appellant's case breaks down.

For a recent and learned discussion of the elements of a common-law marriage, and rights arising thereunder, see the opinion of the Supreme Court by Judge Taylor in Defferari et al. v. Terry et al., 128 Tex. 521, 99 S.W.2d 290, and the authorities therein cited, especially Lewis v. Ames, 44 Tex. 319.

After a careful study of the facts of this record we are driven to the conclusion that the case here made presents none of the elements of lawful marriage or normal family life. It presents but a base and unworthy life attended by none of the characteristics of lawful wedlock except cohabitation.

Under the testimony there is no basis for favorable presumptions in behalf of the appellant's case.

The trial court correctly gave the peremptory instruction to the jury. The judgment is correct and it is affirmed.