**D. D. ST. JOHN, Appellant,**

v.

**Norman D. FITZGERALD, Appellee.**

No. 3171.

Court of Civil Appeals of Texas.

Eastland.

June 24, 1955.

Bradbury, Tippen & Brown, Abilene, for appellant.

McMahon, Springer, Smart & Walter, Abilene, for appellee.

GRISSOM, Chief Justice.

In February, 1952, D. D. St. John and Norman D. FitzGerald formed a partnership known as Saxon Drilling Company. On December 5, 1952, they executed a contract for dissolution of said partnership effective January 10, 1953, in which it was agreed that FitzGerald and certain FitzGerald trust estates should take as their share of the assets of the partnership the note of Norman D. FitzGerald for $200,000 payable to Saxon Drilling Company on or before January 10, 1953, and that St. John should take the physical property of said

company and accounts receivable and pay the debts of said partnership. After dissolution of the partnership St. John filed this suit against FitzGerald for damages, alleging that FitzGerald at the time of the execution of the dissolution agreement on February 5, 1952, had falsely represented that the unpaid bills of the partnership amounted to only $6,000 when the partnership owed about $16,000. FitzGerald took the deposition of St. John and then filed a motion for summary judgment based on the ground that St. John had testified in his deposition that he did not rely on FitzGerald's representations that unpaid bills amounted to only $6,000.00; FitzGerald exhibited said deposition and alleged St. John had unequivocally and specifically testified therein that he did not rely on said representations when the dissolution agreement was executed and, therefore, St. John was not induced thereby to enter into said contract and suffered no damage thereby and FitzGerald was entitled to a summary judgment. Plaintiff answered that a summary judgment should not be rendered because an issue of fact was presented. He filed therewith a counter affidavit to the effect that a material point in the case was whether he relied on FitzGerald's representation that the unpaid bills amounted to only $6,000.00 and that he did rely thereon when he signed the dissolution agreement. St. John stated in his counter affidavit that when FitzGerald first told him that $6,000.00 constituted all the debts of the partnership he did not rely thereon. The affidavit then continued as follows:

"* * * however, during the negotiations and at the same time; that is, at the same meeting that affiant herein had his attorney, the defendant had his bookkeeper, and additional records were secured and the checkbook was produced, and the envelope was produced including the bills that Norman D. FitzGerald said were the total bills in the amount of $6,000.00; and that after affiant's attorney had questioned the defendant and his bookkeeper and after affiant's attorney had discussed the matter with them, in my presence, I felt that after they had produced the check-

book and what he said were the bills in the envelope, that under such circumstances, and where my attorney was present, that then his representations in regard to the unpaid indebtedness of the partnership would be materially true. And it was then, and under such circumstances, that I was willing to go ahead and sign the dissolution agreement because I thought that under the existing circumstances and since my attorney was then satisfied and not that I had not been, but after my attorney was satisfied, well, then, I thought that I could rely on the representation as being true, and did rely on it, and later found out that the representation was not true and that there was more money than had been reported to me and that I had been damaged thereby as a partner for one-half of said indebtedness."

All of Mr. St. John's deposition directly pertinent to the question of whether he relied on said alleged representation of Mr. FitzGerald is as follows:

"74. Now, what was said to you by Mr. FitzGerald about the indebtedness of the partnership at that time * * * that would be * * * (interrupting). A. He told me * * *

"75. * * * the 5 day of December. A. He told me several days before that—he and Leland Kelley both—that we had enough money in the bank to pay all the debts and have $1,500.00 left over.

"76. Where did he tell you that? A. His office. His building.

"77. His building? A. Yes, sir.

"78. What was the occasion of him telling you that? A. We were discussing.

"79. Discussing what? A. How much the company owed.

"80. Is that the time dissolution was talked—contemplated? A. I think it was probably.

"81. You just think it was? A. It's been quite a while ago. I don't know.

"82. You don't know specifically? A. I was fixing to get away from him. I had all I wanted.

"83. Don't volunteer anything. Just answer the questions. A. That's what I'm trying to tell you—I can't tell whether it was or not.

"84. You can't say positively you discussed dissolution at that time? At the time they made that statement to you. A. I couldn't say. I don't know.

"85. At the time, two or three days later, you were in the office with your lawyer and this contract was prepared —what statement or representation was made in regard to the indebtedness of the partnership? A. The best I recall, he brought an envelope up here, and said there was approximately $6,000.00 worth of bills. We had a contract coming in for $5,900.00—(interrupting)

"86. The Gilchrist contract? A. Yes. I figured that would offset it. Mr. Harrell asked him the direct question: he said, 'Is this all the bills?' and he said, 'Yes.'

"87. He said that was all the bills, or all he knew of? A. He said 'All the bills.'

*    *    *    *    *    *

"104. At that time, you say Mr. Harrell asked Mr. FitzGerald what question? A. He asked if this was all the bills.

"105. What did Mr. FitzGerald say? A. He said 'Yes.'

"106. Mr. Harrell asked that question? A. Yes, he asked that direct question.

"107. All right. A. And he stubbed the check book at the same time.

"108. Who did? A. Mr. Harrell.

"109. Did you have the check book there with you? A. Yes, sir.

"110. Who sent for the check book? A. Mr. Harrell.

"111. Your representative sent for it? A. Yes, sir.

"112. Why did you send for it? A. To try to find out how much money was in the bank—see there were no more checks."

*    *    *    *    *    *

"118. In other words, you did have the check book before you? A. Yes, sir.

"119. You did some checking? A. I didn't know which bills were unpaid or had been paid.

"120. You did some checking? A. Yes, sir.

"121. Then you didn't rely on what Mr. FitzGerald told you? You checked yourself? A. I wouldn't rely on it.

"122. You didn't rely on what he said? You didn't believe it—you wanted to see for yourself in the check book? A. Mr. Harrell checked.

"123. I say, that was the reason; you didn't rely on Mr. FitzGerald? A. One of the reasons.

"124. You didn't rely on what Mr. FitzGerald or Mr. Kelley told you? A. I don't know what Mr. Harrell relied on. I didn't.

"125. What he said or told you about the bills was not what induced you to sign the contract? A. I didn't.

"126. You signed the contract; that didn't induce you to sign it? A. I never thought he was totally honest.

"127. You said you didn't believe a word he said, and you didn't believe his representative, and therefore that was not what induced you to sign the contract? A. I wouldn't say that.

"128. What did induce you? A. I was trying to get away from him— break up the partnership.

"129. What he told you that that was all of the bills, you didn't believe him—you sent for the check book? A. Mr. Harrell did.

"130. I know—what he did, you did —he was your lawyer. You wanted to see for yourself. You checked the check book and made an audit? A. Not thoroughly.

"131. In this contract you agreed to assume all outstanding obligations of Saxon Drilling Company. didn't you? A. That was the agreement, but it was with the understanding that $6,000.00 was the amount of it.

"132. I didn't ask you that. In paragraph 2, Section 2 of the paragraph says—you agreed and signed this contract, Exhibit 2—that you "shall assume all of the obligations of the said Saxon Drilling Company, and shall save and hold harmless the other partners from any loss, cost, expense or liability therefor." A. With the understanding that $6,000.00 was all of it.

"133. What understanding? A. That's what he told us.

"134. Let's see if that's correct. A. It was supposed to be approximately $6,000.00, but I paid bills * * * (interrupting)

"135. Didn't that contract also provide that all receipts, including cash on hand of Saxon Drilling Company and any and all receipts received in the interim between the date of this contract and its effective date, shall be applied on the obligations of the said Saxon Drilling Company? It did provide that, didn't it? A. Yes.

"136. What obligations were you talking about? A. $6,000.00 was the day we dissolved, on January 10.

"137. You didn't rely on what Mr. FitzGerald told you? You checked yourself? A. My lawyer checked— that's what I had him for.

"138. You checked—you weren't relying on Mr. FitzGerald—you weren't relying on it? A. I wouldn't rely on him.

"139. And you didn't when you signed that contract? A. In my mind, no.

\* \* \* \* \* \*

"A. I had nothing to do with the books. He was the business partner. I relied on his office.

"205. I thought you said you didn't rely on anything he did. A. At the last, I didn't.

"206. This was right before you quit —December, 1952. You weren't relying on him then, were you? A. (no reply).

"207. Sir? A. I wouldn't rely on him now.

\* \* \* \* \* \*

"220. After applying that money to the indebtedness, you have been relieved to the extent you had assumed it. A. That wasn't the way it was represented to me.

"221. Who represented it differently? A. Mr. FitzGerald.

"222. What did he represent? A. He said $6,000.00 was all the bills that was out; I figured the Gilchrist contract would offset it.

"223. You didn't rely on it? A. That was in the figures in the contract.

"224. You didn't rely on it? A. I didn't believe he was honest."

Defendant's motion for summary judgment was granted, judgment was rendered for defendant and plaintiff has appealed.

The judgment was rendered under the authority of Texas Rules of Civil Procedure, rule 166-A. It was necessarily based on the conclusion that the pleadings,

depositions and affidavits showed conclusively there was no genuine issue as to any material fact and defendant was entitled to a judgment as a matter of law. The purpose of the rule is not to have the court decide the credibility of witnesses, the weight to be given testimony nor issues of fact but to ascertain whether an issue of fact exists. The burden of proof is on the party seeking a summary judgment. Smith v. Bolin, Tex.Sup., 271 S.W.2d 93, 97; Rolfe v. Swearingen, Tex.Civ.App., 241 S.W.2d 236, 241. It has been correctly held that the right to render summary judgment is to be exercised with great caution, giving a litigant the right to the protection of a trial if there is doubt as to the facts, since prompt dispatch of judicial business, although a virtue, is neither the sole nor primary purpose for which courts were established. Penn v. Gulbenkian, Tex.Civ.App., 243 S.W. 2d 220, 223, affirmed 151 Tex. 412, 252 S.W. 2d 929, 931.

In Fowler v. Texas Employers' Ins. Ass'n, Tex.Civ.App., 237 S.W.2d 373, 375, Writ Ref., it was held that in determining whether there is a fact issue the court should apply the same test applicable to a motion for an instructed verdict, treating as true all evidence favorable to the party against whom a summary judgment is sought and indulging in his favor all inferences that can reasonably be drawn from the evidence and resolving all doubts against the movant. In Whelan v. State, Tex.Civ.App., 252 S.W. 2d 271, it was held that the party moving for a summary judgment should be held strictly to a conclusive showing that no fact issue exists. In Loud v. Sears, Roebuck & Co., Tex.Civ.App., 262 S.W.2d 548, it was held that the burden was on the movant to prove that no genuine issue of material fact existed; that all doubts as to the existence of such an issue must be resolved against the movant and that the court should accept as true all evidence of the opposing party and give to him every reasonable inference which could reasonably be drawn in his favor. See also Texas Employers' Ins. Ass'n v. Davis, Tex.Civ.App., 228 S.W.2d 257, Writ Ref.; Sidor v. Dreeben, Tex.Civ. App., 236 S.W.2d 841, RNRE; De La

Garza v. Ryals, Tex.Civ.App., 239 S.W.2d 854, RNRE; Ware v. Wright, Tex.Civ. App., 252 S.W.2d 1003; Brownson v. New, Tex.Civ.App., 259 S.W.2d 277, Writ Dis.

In Smith v. Olsen, 92 Tex. 181, 183, 185, 46 S.W. 631, 632, the Supreme Court in considering the effect of an ex parte deposition used the following language, which is considered appropriate here:

"In course of the proceedings, the defendants took the ex parte deposition of the plaintiff, in accordance with the provisions of the statute upon that subject. One object of the propounding the interrogatories seems to have been to show that the plaintiff had conveyed his title before the bringing of the suit. In his deposition he testified, in substance, that he had 'deeded,' first one-half of the land in controversy to W. A. Morrison, and then one-fourth, and that subsequently, and before suit, he had made and delivered a deed to Witcher and Coffield for the remaining fourth. In order to rebut this testimony, the plaintiff offered to prove by Morrison that neither the first instrument referred to by the plaintiff in his deposition, nor that to Witcher and Coffield, was ever delivered, but that they were each destroyed in the presence of the plaintiff; and, further, that the former was not a conveyance, but a contract to convey, contingent upon a recovery of the land by suit. Upon objection, this testimony so offered was excluded by the court. This, in our opinion, was error. It seems that the court proceeded upon the theory that the plaintiff was bound by the admissions made in his deposition. The right of a party to a suit to take the deposition of his adversary is statutory, and the effect of the deposition when taken must be determined by the statute. * * *

"If the party refuses to answer, the interrogatories are taken as confessed; but there is no provision giving any extraordinary effect to the deposition when he does answer. It does not require the testimony of two witnesses to

overcome it, as in case of a discovery in the chancery practice, or as was required under the repealed act of May 13, 1846, which was intended to take the place of the bill of discovery. See Pasch.Dig. art 3753. On the contrary, the language found in article 2293, quoted above, seems clearly to import that the answers were to stand upon the same footing as those of a witness who is not a party. Such is the evident meaning of the words, 'His examination shall be conducted and his testimony received in the same manner and according to the same rules as apply in the case of any other witness,' etc. Cases which have come to this court show that the procedure in question is frequently resorted to for the purpose of entrapping the opposite party into an unguarded admission; and it doubtless occurs in many instances that a party, in answering interrogatories, uses language against his own interest, which is capable of explanation, and which he ought to have the right to explain. Therefore, to make his answers conclusive would be to make the procedure a means of injustice, which would probably, in the long run, counteract the benefits which might be expected to follow from it. If the legislature had intended to preclude the party by his answers, we should gravely doubt the wisdom of the measure. But, in our opinion, such was not their purpose." See England v. Pitts, Tex.Civ.App., 56 S.W.2d 493, 499, Writ Dis.

R.C.P. 188(f) provides "the adverse party may contradict the answers by any other competent testimony in the same manner as he might contradict the testimony of any other witness."

In Luhning v. Stewart, Tex.Civ.App., 103 S.W.2d 184, 186, it was held that a defendant had the right on the trial to contradict statements in his deposition introduced by the plaintiff. The court cited as authority therefor Smith v. Olsen, supra, and Harrison v. Orr, Tex.Com.App., 296 S.W. 871, 874, and distinguished the cases of Mhoon v. Cain, 77 Tex. 316, 14 S.W. 24 and Thompson v. Moor, Tex.Com.App., 14 S.W.2d 803, 804. The Commission of Appeals, 134 Tex. 23, 131 S.W.2d 824, 827 said:

"Failure to discuss the opinion of the Court of Civil Appeals does not indicate a lack of agreement with its holdings, all of which are approved."

In Pacific Fire Ins. Co. v. Donald, 148 Tex. 277, 224 S.W.2d 204, our Supreme Court held that where a plaintiff on the first trial of a case in his pleadings and deposition alleged and testified he did not know in what company the agent had agreed to insure him that he was not conclusively bound thereby nor was he thereby prevented from testifying on a second trial that the agreement was that he was to be insured by a certain company. In other words, despite such testimony by deposition, the plaintiff was permitted to contradict his deposition testimony.

In Foster v. Woodward, Tex.Civ.App., 134 S.W.2d 417, 420, Writ. Ref., the court said:

"The testimony given by Mrs. Woodward in her oral depositions is subject to the construction that she did not try to escape from the building because of 'imminent or sudden peril' to her life. We overrule appellant's contention that appellees were bound by this testimony. While it is the law that the testimony of a party to a law suit must be construed as binding upon him, Southern Surety Co. v. Inabit, Tex.Civ.App., 1 S.W.2d 412; Wristen v. Wristen, Tex.Civ.App., 119 S.W.2d 1104; Burguieres v. Farrell, Tex.Civ.App., 85 S.W.2d 952; [J. R.] Watkins Co. v. King, Tex.Civ.App., 83 S.W.2d 405; Texas Jurisprudence, vol. 17, pp. 576, 581, that rule is not controlling where he subsequently modifies or explains his former testimony. [J. R.] Watkins Co. v. King, supra. Mrs. Woodward testified clearly to facts showing that she tried to escape through the window because she thought her life was in imminent peril. That testimony rebutted or modified any former statement she made."

In Texas Employers' Ins. Ass'n v. Hale, Tex.Civ.App., 188 S.W.2d 899, 902, affirmed 144 Tex. 432, 191 S.W.2d 472, it was held in a suit to recover workmen's compensation for total permanent disability caused by a back injury that claimant's testimony in a deposition that he was in perfect health, except for a thumb, was not conclusive as an admission.

In Kellner v. Randle, Tex.Civ.App., 165 S.W. 509, writ dismissed for want of jurisdiction, it was held that admissions of a party in an ex parte deposition do not stand on the same footing as admissions by pleadings and may be explained.

In 17 Tex.Jur. 579, the rule is stated that the ex parte depositions of a party to a suit are not conclusive but may be explained or contradicted. See also Texas Law of Evidence, McCormick & Ray, page 644; 169 A.L.R. 798; Lynn v. Haecker, Tex.Civ. App., 244 S.W.2d 539, 542; Gibbons v. Wells, Mo.App., 293 S.W. 89, 91.

Appellant contends the trial court could not on a motion for summary judgment pass on the credibility of appellant or the weight to be given his testimony and, since his testimony by deposition relative to relying on appellee's statement is explained, or contradicted, by his affidavit, that an issue of fact as to whether he relied thereon was raised and the court erred in rendering judgment on appellee's motion. Appellees say appellant's effort to qualify his deposition testimony is only an effort to impeach his previous testimony and the court was correct in disregarding it.

Of course, reliance on the alleged false representation of appellee was an essential of appellant's cause of action. But, the general rule is that testimony of a party by deposition is given only the force of an admission out of court. It may be explained or contradicted on the trial and when an issue of fact is thus presented the credibility and weight of his testimony is to be passed on by the trier of the facts. 169 A.L.R. 798, 805; Foster v. Woodward, Tex.Civ.App., 134 S.W.2d 417.

We are forced to the conclusion that appellant's affidavit in response to the motion for judgment raised an issue of fact as to whether appellant relied on the alleged false representation when he executed the contract dissolving the partnership. The judgment is reversed and the cause remanded for a trial on the merits.